312 Ga. 19
FINAL COPY

S21A0409.  HEADE v. THE STATE.

LAGRUA, Justice.

A Gwinnett County jury found Appellant Demetrius Heade guilty of malice murder and other crimes in connection with the shooting death of Michael Harvey. [1]  On appeal, Appellant contends that (1) the trial court erred in ruling that evidence of Appellant's prior acts was admissible; (2) trial counsel provided ineffective assistance by conceding the admissibility of one of the acts; and (3) these multiple errors cumulatively prejudiced Appellant.  We

---

[1] The crimes occurred on November 10, 2016. A Gwinnett County grand jury indicted Appellant and his co-defendant, Tilisha Tate, for malice murder, felony murder, aggravated assault, and possession of a firearm during the commission of a felony.  In May 2019, the jury found Appellant guilty of all charges.  The trial court sentenced Appellant to serve life in prison without parole for malice murder, life in prison for felony murder, twenty years for aggravated assault to run concurrently with malice murder, and five years for the firearm possession to run concurrently with malice murder.  Appellant filed a motion for new trial on May 20, 2019, which he amended through new counsel on October 7, 2019.  Following an evidentiary hearing, on September 24, 2020, the trial court denied Appellant's amended motion for new trial.  Appellant then timely filed a notice of appeal on September 30, 2020.  This Court docketed Appellant's case to the term beginning in December 2020, and the case has been submitted for a decision on the briefs.

discern no reversible error on these grounds, but we have found two sentencing errors with regard to his convictions for felony murder and aggravated assault. For the reasons stated below, we affirm his convictions in part and vacate in part.

1. Viewed in the light most favorable to the verdicts, the evidence presented at trial showed that on November 10, 2016, at around 7:30 p.m., Appellant and Tilisha Tate, Appellant's girlfriend and co-defendant at trial, visited a Citgo gas station located in Gwinnett County. The two were traveling in a stolen, gold 1996 Honda Odyssey minivan and were meeting with a man who had agreed to purchase food for them because they had run out of money. After accompanying this man into the gas station to buy food, Appellant and Tate left the gas station in the gold minivan; Appellant was driving, and Tate was lying down in the back seat. As they were traveling on Button Gwinnett Drive, the victim, Michael Harvey, attempted to pass the minivan in his truck and accidentally struck the front driver side area of the minivan. The impact startled and awoke Tate, and when she sat up, she saw

Harvey's truck enter a ditch and hit a pole, after which Harvey exited his truck and started running toward the minivan. According to Tate, Appellant then picked up a rifle he had in the minivan and shot Harvey from the driver's seat, and Harvey "hit . . . the ground." Appellant tried to drive away from the scene but was unable to do so because one of the minivan's tires was flat. Appellant and Tate abandoned the minivan and fled toward some woods beside the road. Tate had difficulty keeping up, having recently been shot in the leg by Appellant.[2] Appellant threw the rifle in a ditch, and the two walked to the Las Palmas Apartments, a nearby apartment complex. About an hour later, Appellant and Tate got a ride from another man to the same Citgo gas station where the man replaced the food Appellant and Tate had left in the minivan. Appellant and Tate then stayed overnight with some friends at the apartment complex.

Officers responded to the shooting around 8:30 p.m. They found Harvey lying in the roadway, apparently lifeless, with a bullet

---

[2] We will address this incident in more detail in Division 2 (a) below.

3

wound to his chest. Officers also observed a black truck wrecked on the opposite side of the road and an older model minivan about 80 yards away from the scene with a detached bumper and a single bullet hole through the driver's side window. A few yards away from the minivan, officers recovered a loaded Winchester .30-30 lever-action rifle from a drainage ditch. When officers cycled the lever, the rifle ejected an empty shell casing.[3] Harvey's cause of death was determined to be a gunshot wound to the torso, and a GBI ballistics test concluded that bullet fragments recovered from Harvey's body were fired from the same rifle found at the scene.

Officers discovered that the minivan at the scene had been stolen from Mobile, Alabama on November 2, 2016. Officers testified that they called the police in Mobile, who advised that they were investigating the November 2 theft of the minivan and the murder of the minivan's owner, Lavester Brennan. Gwinnett County officers learned that Appellant and Tate were suspects in the Brennan

---

[3] At trial, one of the officers testified that when this type of weapon is fired, the used shell casing remains in the chamber until the lever is cycled.

4

murder and had used Brennan's credit card in and around the Mobile area after Brennan's murder.

Officers obtained a search warrant for the minivan, and inside they found male and female clothing, a box of ammunition, and multiple .30-30 rounds. Appellant's fingerprints were found on the windows, as well as on items inside the minivan. Officers found receipts from Subway and Little Caesar's restaurants. Appellant was seen in surveillance video from the Little Caesar's, and both Appellant and Tate were seen in surveillance video from the Subway. Plastic bags and food products from a Citgo gas station were also found in the minivan. Officers went to the Citgo gas station near the accident site, and surveillance video from that gas station showed that Appellant and Tate made multiple visits to the gas station before and after the murder. In one video, the two were depicted leaving the gas station, entering a gold minivan, and departing toward the Las Palmas Apartments.

On November 11, the day after the shooting, officers returned to the Citgo gas station. At about 5:30 p.m., Appellant and Tate

5

visited the gas station, and officers apprehended them and took them into custody. Officers then interviewed Appellant and Tate and learned that neither had prior connections to Harvey. Tate told police that neither she nor Appellant were at the scene of the shooting, and that she did not know what was going on. She denied being involved in Harvey's death and denied that she was in the van at the time of the shooting.

Tate was extradited back to Mobile in December 2016. On December 5, 2016, Gwinnett County officers investigating the murder of Harvey traveled to Mobile and interviewed Tate again. At that time, Tate confessed to being present when Appellant shot Brennan in Mobile on November 2, 2016, when Brennan's minivan was stolen, as well as on November 10 when Appellant shot Harvey in Gwinnett County. However, Tate denied knowing that Appellant was planning to shoot Harvey. Tate indicated that she lied in her previous interview because she was scared of Appellant.

2. At a pretrial motions hearing, the trial court ruled that the State could present evidence at trial, over Appellant's objection,

concerning the following three prior acts of Appellant: (1) an alleged assault on Tate in Mobile ("the Tate assault"); (2) the alleged murder of Brennan in Mobile ("the Brennan murder"); and (3) an alleged armed robbery of Heather Crane in Gwinnett County ("the Crane robbery"). The trial court concluded that the probative value of this evidence outweighed any prejudicial effect and that the evidence was admissible to show motive, opportunity, intent, knowledge, and identity, as well as prior difficulties between Tate and Appellant. See OCGA §§ 24-4-403 ("Rule 403") and 24-4-404 (b) ("Rule 404 (b)"). At trial, the jury heard testimony relating to the Tate assault, the Brennan murder, and the Crane robbery, which showed the following:

(a) *The Tate Assault.*

According to Tate, in the summer of 2016, Appellant and Tate started a romantic relationship in Mobile. During this time period, Tate struggled with drug and alcohol addiction, and she regularly engaged in prostitution in exchange for money and drugs. According to Tate, Appellant became possessive of Tate and angry about Tate's

7

prostitution, but he allowed her to perform one "trick" a day so they would have enough money to buy food and other necessities. After Appellant became violent with Tate, Tate ended the relationship and went to stay with friends. Appellant was upset and angry that Tate left him. On October 19, 2016, Appellant confronted Tate at one of her friend's houses saying, "[W]e can do this the easy way or the hard way." Tate said she did not care "which way you want to do it," and Appellant pulled out a handgun and shot Tate in the leg. Tate was transported by emergency personnel to a hospital for treatment, where her leg was placed in a splint and, later, a red cast. While Tate was in the hospital, she reported the shooting to law enforcement officers. After Tate's release from the hospital, she stayed briefly with a friend, but she soon resumed her relationship with Appellant.

(b) *The Brennan Murder*.

According to Tate, on November 2, 2016, Tate and Appellant were at a house in Mobile when Lavester Brennan drove by in his gold minivan. According to Tate, she regularly had sex with

8

Brennan in exchange for money and drugs, and she stopped him and asked him to take her to get something to eat. Brennan then drove Tate to get some food. When Tate returned, Appellant was angry because he did not know why Tate left with Brennan. Tate met with Brennan again later the same day to use drugs at Brennan's house. After Brennan and Tate got into an argument, Brennan began to give Tate a ride back to where she was staying. While they were stopped at a corner by Brennan's house, Appellant pulled up beside Brennan's minivan in a truck. Appellant got out of the truck and entered the minivan behind Tate, who was seated in the front passenger seat. Tate got out of the minivan and heard a gunshot. Appellant grabbed Tate's collar and forced her back into the front passenger seat of the minivan. Appellant then dragged Brennan out of the driver's seat and onto the street and drove away in the minivan. Tate testified that she did not run or scream for help out of fear of Appellant. Brennan died several days later from a gunshot wound to the chest.

According to Tate, Appellant and Tate drove to Appellant's

cousin's house, where Appellant picked up a .30-30 "shotgun." While they were at the cousin's house, Appellant cut the red cast off Tate's leg with a knife. Tate testified that she needed the cast and could not put any pressure on her foot, but Appellant demanded they remove it, stating, "[T]hey was going to be looking for somebody with a red cast." Appellant and Tate then drove around the Mobile area in the minivan and made purchases, including shoes, televisions, cell phones, and beauty products, at several stores using Brennan's credit card, which had been left in the minivan.[4] When they tried to purchase another television at Walmart, the card was declined. At that point, Appellant and Tate had very little money left, and they left the area and drove to Gwinnett County in Brennan's minivan. Around this time, Tate used a cell phone she had purchased to find news articles about what happened to Brennan in Mobile, but could not find anything. The two arrived at the Peachtree Inn and Suites in Gwinnett County on or about November 7, 2016, and slept in the

---

[4] The activity on Brennan's credit card assisted authorities in identifying Appellant and Tate as the suspects in Brennan's murder.

minivan for a couple of days. They also visited and stayed at the Las Palmas Apartments between November 9 and 11. At some point before Harvey's murder, Appellant and Tate tried to pawn Brennan's minivan in Gwinnett County because they were out of money, but they could not do so because they did not have the title to the vehicle.

(c) *The Crane Robbery.*

According to Tate, Appellant robbed Heather Crane before noon on November 10, the day of Harvey's murder. Appellant threatened Crane, a guest of the Peachtree Inn and Suites, by pointing the rifle at her and taking her purse. After removing the little money found inside Crane's purse, Appellant abandoned the purse at a Subway.

Dominique Upshaw, Crane's boyfriend at the time, testified that after the robbery,[5] Crane entered their shared hotel room and was "frantic." Crane said a man in a vehicle approached her outside the hotel, pointed a gun at her, and robbed her. Crane then reported

_____

[5] Crane passed away prior to trial.

the theft to hotel staff. Rana Jawanda, the owner of the hotel, retrieved surveillance video of the robbery and showed Crane the video of the theft. During their subsequent conversation, Crane gave Jawanda a more detailed description of the events, including that the perpetrator was traveling in a Japanese model van with a female occupant. Crane stated that the man exited the van and held Crane at gunpoint with an old, rusted, double-barrel gun. At trial, Jawanda identified Brennan's minivan as the one shown in the hotel surveillance video depicting the robbery of Crane.

3. Turning to Appellant's specific contentions with respect to the trial court's admission of these prior acts, Appellant contends that the trial court erred (a) by ruling in its order denying Appellant's motion for new trial that these acts were intrinsic evidence, and (b) by admitting these acts at trial as extrinsic evidence. We conclude that the evidence was properly admitted as intrinsic evidence, so we need not address its potential admission as extrinsic evidence under Rule 404 (b). See *Smith v. State*, 307 Ga. 263, 272 (2) (c) (834 SE2d 1) (2019) ("[B]ecause the evidence was

12

intrinsic, it was outside the reach of Rule 404 (b)." (citation and punctuation omitted)).

> Evidence is admissible as intrinsic evidence when it is (1) an uncharged offense arising from the same transaction or series of transactions as the charged offense; (2) necessary to complete the story of the crime; or (3) inextricably intertwined with the evidence regarding the charged offense . . . . [E]vidence pertaining to the chain of events explaining the context, motive, and set-up of the crime is properly admitted if it is linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury . . . . [E]vidence of other acts is inextricably intertwined with the evidence regarding the charged offense if it forms an integral and natural part of the witness's accounts of the circumstances surrounding the offenses for which the defendant was indicted. And this sort of intrinsic evidence remains admissible even if it incidentally places the defendant's character at issue.

*Williams v. State*, 302 Ga. 474, 485-486 (IV) (d) (807 SE2d 350) (2017) (citations and punctuation omitted). "[T]here is no bright-line rule regarding how close in time evidence must be to the charged offenses, or requiring evidence to pertain directly to the victims of the charged offenses, for that evidence to be admitted properly as intrinsic evidence." *Harris v. State*, 310 Ga. 372, 381 (2)

13

(b) (850 SE2d 77) (2020). "[W]e review a trial court's ruling admitting evidence as intrinsic for an abuse of . . . discretion." Id. at 377.

Here, all three acts were part of the chain of events leading to the charged crimes. The Tate assault illustrated Tate's tumultuous relationship with Appellant and explained why she was afraid of Appellant. It demonstrated why she stayed with Appellant until and after Harvey's murder, even initially denying their involvement because she feared Appellant. See *McCammon v. State*, 306 Ga. 516, 522 (2) (832 SE2d 396) (2019) (co-defendant's testimony that he and appellant smoked marijuana together six months before the murder, "[w]hile . . . further afield from the charged crimes, . . . was a natural part of [the co-defendant's] account of his relationship with [a]ppellant"); see also *Williams*, 302 Ga. at 486 (prior act helped explain to jury, among other things, why a victim refused the defendant's advances and the motive for the victim to end her relationship with the defendant). The evidence also explained why Tate had a red cast on her leg, which Appellant later sought to

14

remove to avoid detection by authorities.  When considered in light of the other evidence in this case, evidence of the Tate assault was reasonably necessary to complete the story for the jury and was therefore intrinsic evidence.  See *Harris*, 310 Ga. at 378 (2) (b) (evidence was necessary to complete story for the jury, and therefore intrinsic, where it explained motivation and offered context to other witnesses' accounts).

Similarly, the Brennan murder explained why Appellant and Tate were driving Brennan's gold minivan and why they had fled from Mobile, Alabama to Gwinnett County.  Through the minivan, Appellant was tied not only to Brennan's murder, but also to the credit card transactions in Mobile, the Crane robbery, and ultimately to Harvey's murder.  Perhaps most importantly, the Brennan murder explained Appellant's motive to evade authorities. Appellant went so far as to remove the red cast from Tate's leg immediately after the Brennan murder because he believed "they was going to be looking for somebody with a red cast."  This motive explained why he shot Harvey; killing Harvey after the car crash

15

would delay the police response to the crash and eliminate the only witness. Indeed, Appellant continued to evade capture after murdering Harvey, as Tate testified that, as they were fleeing the scene, Appellant said, "[S]ee what you made me do?" He also talked about how he was going to make Tate engage in more prostitution to get money for a bus ticket. Therefore, the Brennan murder was also an important part of the story and admissible as intrinsic evidence.

The Crane robbery was the next link in Appellant and Tate's crime spree. After stealing Brennan's minivan and exhausting the credit cards they found in the minivan, Appellant and Tate were in need of money. The armed robbery, in which Appellant used the stolen minivan and the rifle, was how he obtained money. Surveillance video indicated that the perpetrator of the robbery was in a gold minivan identical to the one Appellant had stolen from Brennan. Appellant later abandoned the purse he stole from Crane at the same Subway restaurant for which a receipt was found in the van after the Harvey murder. And the robbery added another

16

reason for Appellant to avoid capture by the police. Therefore, the Crane robbery, while not strictly necessary to the prosecutor's case, was nonetheless reasonably necessary to complete the story for the jury. See *Harris*, 310 Ga. at 379 (2) (b) ("[A]lthough evidence of the uncharged criminal conduct may not be necessary to prove the charged offense, there is no requirement that the government proffer only enough evidence to allow the jury to convict, and no more, and this evidence helped the jury understand the sequence of events that led to the discovery of the firearm, and to [the appellant's] arrest." (citation and punctuation omitted)). Accordingly, evidence of the Crane robbery was relevant as intrinsic evidence.

"Relevant [intrinsic] evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." OCGA § 24-4-403. "There is no mechanical solution for this balancing test," and "a trial court must undertake in each case

17

a considered evaluation of the proffered justification for the admission of such evidence and make an independent determination." *State v. Jones*, 297 Ga. 156, 163 (3) (773 SE2d 170) (2015). We have explained that this balance should be struck in favor of admissibility. See *Carston v. State*, 310 Ga. 797, 803 (3) (b) (854 SE2d 684) (2021); see also *Hood v. State*, 309 Ga. 493, 500-501 (2) (847 SE2d 172) (2020) ("[O]ther acts evidence should be excluded if it constitutes [a] matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." (citation and punctuation omitted)). "[I]n reviewing issues under Rule 403, we look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact." *Anglin v. State*, 302 Ga. 333, 337 (3) (806 SE2d 573) (2017) (citation and punctuation omitted).

As explained above, the three prior acts here were probative to explaining the context of the charged crimes, the relationship between Appellant and Tate, why Appellant and Tate were in a stolen gold minivan with a rifle, why Tate was reluctant to leave

18

Appellant, and why Appellant and Tate were in Gwinnett County in the first place. Most importantly, the Brennan murder and the Crane robbery were highly probative of Appellant's motive for killing Harvey after Harvey caused an accident — Appellant was fleeing authorities and evading apprehension for Brennan's murder and Crane's robbery, as the prosecutor argued at trial. Furthermore, the trial court gave a limiting instruction to the jury, directing it to consider the evidence only on the issues of intent, identity, knowledge, motive, and opportunity, which reduced the prejudicial impact to Appellant. Thus, the trial court could determine, in its discretion, that the prejudicial impact of the three acts, while significant, was not unfair and did not substantially outweigh the probative value of this evidence. See *Mosley v. State*, 307 Ga. 711, 715 (2) (838 SE2d 289) (2020) (evidence suggested that appellant engaged in a crime spree, and "though the intrinsic evidence indirectly implicated [the appellant] in additional criminal acts and had only minimal evidentiary value, we cannot say that the trial court abused its discretion in concluding that the probative

19

value of this evidence was not substantially outweighed by the danger of unfair prejudice"); see also *Anglin*, 302 Ga. at 337 (3) ("[I]n a criminal trial, inculpatory evidence is inherently prejudicial; it is only when *unfair* prejudice substantially outweighs probative value that [Rule 403] permits exclusion." (citation and punctuation omitted)). Accordingly, we hold that the trial court did not abuse its discretion in finding that the three prior acts were admissible as intrinsic evidence.

Appellant further argues that these three acts were inadmissible as extrinsic evidence under Rule 404 (b).[6]  However, the trial court provided a limiting instruction to the jury, which narrowed the scope for which the jury could consider the evidence and thus minimized any potential harm.  Because the evidence was properly admitted as intrinsic evidence, however, we need not address its admission as extrinsic evidence under Rule 404 (b).  See *Smith*, 307 Ga. at 272 (2) (c).  See also *Williams*, 302 Ga. at 485 (IV)

---

[6] As discussed above, the acts would have been admissible under Rule 404 (b) at least for the purpose of motive.

20

(d) ("The limitations and prohibition on other acts evidence set out in OCGA § 24-4-404 (b) do not apply to intrinsic evidence." (citation and punctuation omitted)); *United States v. Rolett*, 151 F3d 787, 790 (8th Cir. 1998) ("Although both parties treated the evidence of other acts as [federal] Rule 404 (b) evidence, this court finds that such evidence is intrinsic evidence which is inextricably intertwined as an integral part of the immediate context of the crime charged." (citation and punctuation omitted)). Accordingly, Appellant's enumerations regarding the admissibility of the three prior acts fails.

4. Appellant next raises two related enumerations of error regarding the admission of the Tate assault evidence: that (a) the trial court erred in ruling that the Tate assault was admissible as a "prior difficulty" and (b) trial counsel provided constitutionally deficient performance by conceding that the Tate assault was admissible as a prior difficulty.

(a) At the pretrial motions hearing, the State proffered the Tate assault evidence as a prior difficulty between Appellant and Tate,

21

arguing that it was admissible to show the state of their relationship. Appellant's counsel conceded that this particular incident was admissible as a prior difficulty and did not object to its admission.

Because Appellant did not object to the admission of the Tate assault, we review this claim only for plain error. See *Brewner v. State*, 302 Ga. 6, 12 (III) (804 SE2d 94) (2017) (plain error review where appellant did not assert any objection when other acts evidence was first introduced at trial). To prove plain error, among other things, "there must be an error or defect — some sort of deviation from a legal rule — that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant." Id. (citation and punctuation omitted). Appellant conceded that the Tate assault evidence was admissible. Thus, Appellant affirmatively waived this error and cannot show plain error. Accordingly, this enumeration of error fails.

(b) Appellant contends that his trial counsel was constitutionally ineffective for conceding the admissibility of the

22

Tate assault evidence. We disagree.

To succeed on a claim of ineffective assistance of counsel, Appellant "must prove both that his lawyer's performance was professionally deficient and that he was prejudiced as a result." *Styles v. State*, 309 Ga. 463, 471 (5) (847 SE2d 325) (2020) (citation and punctuation omitted); see also *Strickland v. Washington*, 466 U. S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). "[I]f [Appellant] fails to establish one prong, we need not examine the other." *Armstrong v. State*, 310 Ga. 598, 607 (5) (852 SE2d 824) (2020) (citation and punctuation omitted).

We have explained that "[t]here is no deficient performance when an attorney fails to object to admissible evidence." *Perera v. State*, 295 Ga. 880, 884-885 (3) (b) (763 SE2d 687) (2014) (citation and punctuation omitted). As discussed above, the Tate assault was admissible as intrinsic evidence, and therefore trial counsel did not perform deficiently. Appellant's ineffective assistance claim accordingly fails.

5. In his final enumeration of error, Appellant contends that

23

the cumulative effect of the alleged errors warrants a new trial. See *State v. Lane*, 308 Ga. 10, 17 (1) (838 SE2d 808) (2020) ("We hold that the proper approach [to assessing multiple trial court errors] . . . is to consider collectively the prejudicial effect, if any, of trial court errors, along with the prejudice caused by any deficient performance of counsel). Here, Appellant has shown no error with respect to the admission of the three prior acts, as they were admissible as intrinsic evidence. Accordingly, there was no error, much less any cumulative error, and Appellant's enumeration fails.

6. Although Appellant does not raise any sentencing issues on appeal, we have identified two errors in his sentencing. See *Dixon v. State*, 302 Ga. 691, 696-697 (4) (808 SE2d 696) (2017) ("We have the discretion to correct merger errors sua sponte . . . because a merger error results in an illegal and void judgment of conviction and sentence."). Appellant was charged with and found guilty of malice murder, felony murder predicated on aggravated assault, aggravated assault, and possession of a firearm during the commission of a felony. The trial court sentenced Appellant to serve

24

life in prison without the possibility of parole for malice murder; life in prison concurrent for felony murder; 20 years concurrent for the predicate felony of aggravated assault; and five years consecutive for the firearm possession charge.

The trial court's sentencing with regard to the felony murder was error, as the felony murder count should have been vacated by operation of law. "[W]hen a valid guilty verdict is returned on both malice murder and felony murder of the same victim, the defendant should be sentenced for the malice murder, and the alternative felony murder count stands *vacated* by operation of law as simply surplusage." *Hulett v. State*, 296 Ga. 49, 53 (2) (766 SE2d 1) (2014) (citation and punctuation omitted; emphasis in original). Here, there was only one victim in relation to both the malice murder and felony murder counts. "It follows that the trial court erred in failing to sentence [Appellant] only on the malice murder count and that the separate sentence[ ] on the . . . alternative felony murder count[ ] must be vacated," because the felony murder conviction was "simply surplusage." *Malcolm v. State*, 263 Ga. 369, 372 (4) (434

25

SE2d 479) (1993) (citation and punctuation omitted). Accordingly, we vacate Appellant's conviction and sentence for felony murder.

The trial court's sentencing with regard to the aggravated assault count was also error. "When the same conduct of an accused may establish the commission of more than one crime, the accused may be prosecuted for each crime. He may not, however, be convicted of more than one crime if . . . [o]ne crime is included in the other[.]" OCGA § 16-1-7 (a) (1). Separate convictions for the malice murder and aggravated assault of a single victim may be permitted where there is a deliberate interval between the infliction of a non-fatal injury and a subsequent fatal injury. See *Johnson v. State*, 300 Ga. 665, 666-667 (2) (797 SE2d 903) (2017). Here, however, Appellant fired a single bullet that killed Harvey, and the single shot was the basis for both the aggravated assault and the malice murder charges; there was no evidence of a deliberate interval. Therefore, the trial court should have merged the aggravated assault charge with the malice murder conviction. Accordingly, we vacate Appellant's conviction and sentence for aggravated assault. See id.

26

at 667 ("In the absence of some evidence of a 'deliberate interval' between the infliction of any of the wounds the victim suffered, we must vacate [the appellant's] aggravated assault conviction.").

*Judgment affirmed in part and vacated in part. All the Justices concur, except McMillian, J., who concurs in judgment only in Division 3.*

Decided June 21, 2021.

Murder. Gwinnett Superior Court. Before Judge Rich.

*Kelsey L. Geary*, for appellant.

*Patsy A. Austin-Gatson, District Attorney, Sabrina Nizamuddin, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew B. Crowder, Assistant Attorney General*, for appellee.