NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: February 7, 2023

S22A1223. JACKSON v. THE STATE.

LAGRUA, Justice.

Appellant Desmond Sherron Jackson was convicted of felony murder and other crimes in connection with the fatal shooting of Heather Smith, the shooting of Quantavious Banks, and the aggravated assault of Kendaishia Jefferies, all of which occurred on August 20, 2017. On appeal, Appellant contends that the evidence was legally insufficient to support his convictions, that the trial judge erred by not recusing himself, and that the trial court erred by allowing improper extrinsic evidence to be presented against Appellant at trial.[1] For the reasons that follow, we affirm

---

[1] In October 2017, Appellant was indicted by a Walton County grand jury on charges of malice murder, felony murder, three counts of aggravated assault, aggravated battery, and five counts of possession of a firearm during the commission of a felony. In May 2019, a jury found Appellant guilty of all counts except malice murder and one count of possession of a firearm during

Appellant's convictions.

Viewed in the light most favorable to the verdicts, the evidence presented at Appellant's trial showed that approximately a week and a half before the shootings in this case occurred, Appellant and Banks got into a dispute over a botched drug transaction. According to Banks's testimony at trial, on or about August 10, 2017, Banks went to the house where Appellant was staying in Social Circle to purchase four ounces of marijuana from Appellant. Banks testified that, although he paid Appellant for four ounces of marijuana, Appellant gave Banks less than that amount in the sale. Later that day, when Banks opened the package and discovered he had been "shorted," he went back to Appellant's house to pick up the rest of

the commission of a felony. The trial court sentenced Appellant to life in prison, plus an additional 40 years. One of the aggravated assault counts merged with the felony murder count for sentencing purposes. On June 3, 2019, Appellant filed a timely motion for new trial, which he amended twice through new counsel on March 11, 2021, and June 29, 2021. The State filed a response in opposition to the motion for new trial on June 1, 2022, and Appellant amended his motion for new trial a third time on June 10, 2022, after which he waived his right to a hearing on the motion. The trial court considered the existing record and denied Appellant's motion for new trial without a hearing on June 20, 2022. Appellant filed a timely notice of appeal to this Court on June 27, 2022, and the case was docketed to the August 2022 term of this Court and submitted for a decision on the briefs.

the marijuana he had purchased. According to Banks, when he went inside Appellant's house, Appellant was sitting around with some other people and told Banks that "he was going to straighten it out but he couldn't right then and there." Banks and Appellant started to argue, and Banks said he "had already done paid [Appellant], [he] can't be waiting." Banks then observed some marijuana sitting on the table, so he took it and left, acknowledging that he "got more weed than [he'd] really paid for."

Over the next few days, the dispute between Banks and Appellant escalated. Banks testified that, when he took the marijuana and walked out, no one said anything to him, but later, he received "phone calls saying [Appellant] and his people better not see me no more." Banks said he also received "threats about [his] daughter and all type of other stuff," including hostile postings about the incident on Facebook from associates of Appellant. According to Banks, "that's how [he] knew then there was a problem."

However, Banks also admitted to posting a statement on his Facebook account suggesting he wanted to fight Appellant "one on

3

one." And, according to the trial testimony of Appellant's girlfriend, Banks frequently drove by Appellant's house and would "lay on the horn." Appellant's brother, Datavious Sheats, testified that he also received a threatening phone call after the incident from Smith, Banks's girlfriend. In addition to threatening phone calls and Facebook posts, Banks, Smith, and some of Appellant's friends and relatives were also involved in at least two hostile encounters during this time period.

The first encounter took place on August 13, 2017. According to Charles Shy, a friend of Appellant's, Shy was hanging out at a house in Social Circle on August 13 when Banks and Smith stopped by looking for Appellant. Shy testified that Smith stayed in the car, but Banks came inside the house and, "in so many words[,] said that he was trying to justify the fact that he robbed [Appellant] and when he seen [Appellant] he was going to handle it." Shy testified that Banks had a "firearm on his hip," but Banks did not "pull it out, point it at [Shy], threaten anybody or anything like that." Shy stated that he thought Banks was just trying to scare them and

4

"make it known that he was going to handle [Appellant] when he saw him." Banks and Smith left after this exchange with Shy.

A few minutes later, Banks and Smith showed up at the nearby home of Darius Still, another friend of Appellant's. Shy, who had come over to Still's house after the encounter with Banks, testified that Smith stayed in the car again, but Banks came up to the house with a gun "on his hip," asking where Appellant was. According to the trial testimony of Shy and Sheats, as well as Appellant's statement to the police, Appellant and Sheats were also at Still's house at this time, but they hid in a closet when Banks and Smith pulled up in front of the house. Shy testified that Appellant appeared to be "trying to avoid the situation—at all costs." Shy also testified that during this second exchange with Banks, Banks did not point his gun at anyone or threaten anyone with it.

The next day, Banks and Smith got into an argument with Appellant's mother, Keshia Jackson, outside of Ms. Jackson's home. Ms. Jackson testified at trial that she was standing on her front porch talking on the telephone when Smith, who was down the

5

street with Banks, started yelling at Ms. Jackson and calling her names. According to Ms. Jackson, Banks and Smith then approached Ms. Jackson's house, and Banks had a gun "tucked into his pants." Ms. Jackson said that Banks did not point the gun at her, but told her that he "was going to do" Appellant and "was going to take [Appellant] out because [Banks] was tired of the back and forth." Ms. Jackson testified that she knew Appellant and Banks were in a disagreement because she "understood [Banks] stole money from [her] son."

Sheats testified that he was at Ms. Jackson's house at the time of her encounter with Banks and Smith, and he heard Smith "telling us they was going to kill us." Sheats said that Ms. Jackson then "made [Sheats] leave," so he left the house. According to Banks, Sheats was armed when Banks and Smith encountered him at Ms. Jackson's house, and Sheats threatened them, saying, "we're gonna catch you slipping." Ms. Jackson and Sheats testified that when they told Appellant about this encounter, Appellant was "terrified."

Several days later, on August 20—the day of the shootings—

Banks and Smith gave Smith's close friend, Jefferies, and Jefferies's one-year-old son a ride to Rutledge so Jefferies could take her son to a relative's house. According to Jefferies, on the way to Rutledge from Social Circle, Banks stopped and left his gun at a friend's house because "he didn't want to ride with the gun to Rutledge."[2] Jefferies testified that, after they dropped off her son and were driving back to Social Circle, Banks received a phone call from Appellant. Jefferies testified that Banks put the call on speaker phone, and she overheard Appellant say to Banks, "[B]ring my stuff back or ya'll going to have to see about me." Jefferies said Banks and Appellant then had several phone conversations during the drive, and she heard Banks tell Appellant, "[Y]ou need to check my résumé . . . I ain't bringing nothing back."

According to Banks, this phone call was the first time he spoke directly to Appellant after the incident on August 10. Banks testified that, when Appellant called him the first time, Appellant said he was at his house and asked Banks to "[s]hoot [him] or one,"

_____

[2] At trial, Banks testified that he did not have a gun with him that day.

7

meaning Appellant wanted to fight Banks "one on one." Banks responded, "all right" and started driving towards Appellant's house.

According to Jefferies, she asked Banks to drop her off before he went to Appellant's house, but Banks said he "just going to go ahead and go up here and see what [Appellant] wants." Jefferies testified that, when they arrived at Appellant's house around 1:00 or 2:00 p.m., they did not see Appellant outside the house. So, Banks drove a short distance away and called Appellant, telling him, "[Y]ou called me up here, come outside." Banks then drove back to Appellant's house and parked the car at the intersection adjacent to it. Smith was sitting in the front passenger seat, and Jefferies was sitting in the backseat behind Banks. The window next to Jefferies was rolled down.

Jefferies testified that, when they pulled back up to the intersection, Appellant was standing on the front porch of his house, "right there by the door," armed with an AR-15. Banks jumped out of the car and started "walking fast" into the front yard of

8

Appellant's house. Jefferies saw Banks lift up his shirt and beat on his chest, saying to Appellant, "You need to check my résumé." According to Jefferies, as Banks approached Appellant's front porch from the yard, Appellant told Banks to "step back." Banks testified that he turned around at this point because—although Appellant had told him "to pull up and fight"—Appellant had a gun, so Banks was not "fixing to get into it with [Appellant]."

According to Banks and Jefferies, as soon as Banks turned around and started walking back towards the car, Appellant started shooting, hitting Banks in the back of his right leg.[3] Banks fell to the ground. Jefferies testified that Smith got out of the car on the passenger side to check on Banks, and as Smith started walking around the back of the vehicle, Appellant shot her twice—once in the arm and once in the chest.[4] Smith grabbed her chest and said to Jefferies, who was still seated in the backseat, "[H]e done shot me.

---

[3] An orthopedic surgeon testified that the bullet shattered Banks's right femur and then exited his right leg on the groin side, grazing his left leg.

[4] The record reflects that when Banks was shot, he fell to the ground about 78 feet from the front porch of Appellant's house, and when Smith was shot, she fell about 93 feet from the front porch of Appellant's house.

Call the police." Smith slid to the ground beside the car.[5]

Jefferies testified that she remained in the backseat of the car during the shootings, "praying that she would not get shot." Several of the gunshots struck the car near where Jefferies was seated. After Smith was shot, Jefferies heard Appellant say, "[W]hoever in the back seat need to step out" because "he was fixing to get ready to shoot[] up the car." Jefferies also overheard Appellant's friend, Still, who was standing on the front porch with Appellant, tell Appellant to shoot her and "leave no witnesses." As Jefferies stepped out of the car, she looked down at Smith's body and saw that her chest was soaked with blood and she was not moving. Banks asked Jefferies what was going on, and she told him that Smith was dead. Jefferies testified that she and Appellant are cousins, and when she stepped out of the car, she could tell Appellant recognized her. Jefferies then heard Appellant ask one of his friends for a phone to call the police.

---

[5] The medical examiner testified that Smith died from a gunshot wound of the chest.

The police arrived at the scene several minutes later. Jefferies did not approach the police, but instead, walked to a nearby relative's house because she was "in shock mode." Emergency medical personnel also arrived on the scene shortly thereafter and transported Banks to the hospital. The police located Appellant's AR-15—the only weapon found at the scene—and nine shell casings just inside the front door and on the front porch of Appellant's residence. Appellant was arrested and taken into custody.

During Appellant's custodial interview, the police asked him what "led up" to the shootings, and Appellant told the police that, earlier that day, he called Banks and "asked him was he going to give [Appellant] [his] stuff—[his] money back. And [Banks] started talking sh**." Appellant explained that, two weeks prior to the shootings, Banks had "snatched all [Appellant's] money and ran out of the house," and since that time, Banks had "been looking for [Appellant]," "talking sh**" to Appellant and his "momma," and "threatening [Appellant's] little brother." Appellant said that, "every other day ever since [the robbery] happened," Banks would

11

"ride up and down the street" where Appellant lived and follow Appellant, once forcing Appellant to hide in the back room of his cousin's house. Appellant said he "really felt threatened" and "like [his] back was against the wall." The police asked Appellant why he did not contact them "when [Banks] robbed [Appellant] a couple weeks ago," and Appellant responded that he did not "want to see nobody get in trouble" and "just want[ed] [his] money back."

Appellant told the police that he was "tired of it" and decided to call Banks about getting the money back. Appellant said when he called Banks earlier that day, Banks "started getting irate on the phone." And, when Banks pulled up to Appellant's house and jumped out of the car, Appellant knew he had to "protect [him]self," explaining that "[Banks] was going to hurt [Appellant] or [Appellant] was going to hurt [Banks]." And "[Appellant] wasn't going to let [Banks] hurt [him]." As Banks was "coming down the yard" and "walking toward" Appellant, Appellant "opened the door and step[ped] out with the gun and point[ed] it at [Banks]." When Banks "kept walking up," Appellant "shot," and when Smith got out

12

of the car, Appellant "shot over there, too." Appellant "just shot [until] it wouldn't shoot no more." Appellant admitted that he did not see Banks or Smith with a gun that day and had, in fact, never seen them with a gun before. Appellant also acknowledged that Banks was not close to him when Appellant started shooting at Banks.

At trial, Banks and Jefferies testified that neither Banks nor Smith was armed at the time of the shootings—Jefferies confirmed that the only gun she ever saw on Banks was the one he dropped off earlier in the day before arriving in Rutledge. According to Jefferies, Banks "never fired no shots," and Appellant "never fired no shots until Banks turned his back," and "that's when [Appellant] started firing the shot." Jefferies said that Banks wanted "to fight," but Appellant wanted "to shoot."

1. On appeal, Appellant contends that the evidence was insufficient to authorize a rational trier of fact to find him guilty beyond a reasonable doubt of all the charges of which he was convicted. When evaluating challenges to the sufficiency of the

13

evidence as a matter of constitutional due process, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979) (emphasis in original). "This Court views the evidence in the light most favorable to the verdict, with deference to the jury's assessment of the weight and credibility of the evidence." *Sams v. State*, 314 Ga. 306, 309 (2) (875 SE2d 757) (2022) (citation and punctuation omitted). Applying this standard, we conclude that the evidence was sufficient to support Appellant's convictions, and thus, Appellant's challenges—discussed in more detail below—are without merit. See id.

(a) *Aggravated Assault Against Jefferies and Related Charge*

Appellant contends that the evidence was legally insufficient to support his convictions for aggravated assault against Jefferies and the related charge of possession of a firearm during the commission of a felony. In support thereof, Appellant argues that,

14

while the evidence established that gunfire struck the vehicle in which Jefferies was seated, the evidence did not show that Appellant pointed the AR-15 directly at Jefferies or establish the specific area of the car where Appellant pointed his weapon. Additionally, Appellant argues that Jefferies never testified to being in fear of her safety or her life or to being in reasonable apprehension of immediately receiving a violent injury. And Appellant contends that, because Jefferies left the scene after the shootings occurred without speaking to the police, a reasonable hypothesis exists that she did not believe a crime had been committed against her.

> A person commits the offense of aggravated assault [under OCGA §§ 16-5-20 and 16-5-21] when he uses a deadly weapon to commit an act which places another person in reasonable apprehension of immediately receiving a violent injury. Whether a victim has been placed in reasonable apprehension of injury is a question of fact, which may be established by indirect or circumstantial evidence. The presence of a deadly weapon would normally place a victim in reasonable apprehension of being injured violently.

*Stewart v. State*, 299 Ga. 622, 626 (2) (a) (791 SE2d 61) (2016) (citation and punctuation omitted).

In this case, Jefferies testified extensively about witnessing Appellant shoot Banks and Smith, while "praying that she would not get shot." Jefferies also testified that Appellant told her to get out of the car because he "was fixing to get ready to shoot[] [it] up." When Jefferies exited the car, she had to step over Smith's body, and she overheard Appellant's friend tell him to shoot her so there would be no witnesses. The State also presented evidence that several gunshots struck the driver's side of the vehicle close to the area where Jefferies was seated.

A jury could infer from this evidence that Jefferies was placed in "reasonable apprehension of immediately receiving a violent injury." OCGA § 16-5-20 (a) (2). Therefore, the evidence was "sufficient to prove the aggravated assault," as well as the possession of a firearm during the commission of a felony predicated on that aggravated assault. *Stewart*, 299 Ga. at 626 (2) (a) (citation omitted).

(b) *Felony Murder and Related Charges*

Appellant also contends that the evidence was insufficient to

support his convictions for felony murder, aggravated assault, aggravated battery, and possession of a firearm during the commission of a felony because there was evidence presented to show that, when Appellant shot Banks and Smith, he was acting in self-defense or as a result of a sudden, violent, and irresistible passion, resulting from the victims' serious provocation and repeated attempts to confront Appellant. We disagree.

"A person is justified in threatening or using force against another when and to the extent that he or she reasonably believes that such threat or force is necessary to defend himself or herself or a third person against such other's imminent use of unlawful force." OCGA § 16-3-21 (a). However, "[a] person is justified in using force which is intended or likely to cause death or great bodily harm only if he or she reasonably believes that such force is necessary to prevent death or great bodily harm to himself or herself or a third person or to prevent the commission of a forcible felony." *Nelson v. State*, 283 Ga. 119, 120 (1) (657 SE2d 201) (2008) (citing OCGA § 16-3-21 (a)). "A homicide is not justified if the force used by the

17

defendant exceeds that which a reasonable person would believe was necessary to defend against the victim's unlawful act." Id. (citations and punctuation omitted). The evidence in this case was more than sufficient for the jury to reject Appellant's assertion that he was acting in self-defense when he shot Banks and Smith.

No evidence was presented to show that, at the time of the shootings, Banks or Smith was armed or that Appellant was otherwise in danger of the "imminent use of unlawful force" which was "likely to cause death or great bodily harm." OCGA § 16-3-21 (a). In fact, Appellant told the police that he did not see Banks or Smith with a gun that day, and the only weapon found at the scene was the AR-15 used by Appellant. The evidence showed that, when the shooting occurred, Banks was not within close range of Appellant—who never left his front porch—and Banks was walking back towards his car. Similarly, Smith was not threatening Appellant in any way at the time he shot her. Accordingly, the jury was authorized to reject Appellant's justification defense in this case.

The jury was also authorized to reject the theory that Appellant was acting as a result of a sudden, violent, and irresistible passion when he shot Banks and Smith. See OCGA § 16-5-2.[6] In this case, the trial court charged the jury on voluntary manslaughter and instructed the jury that, "if after consideration of all the evidence and before you would be authorized to return a verdict of guilty of malice murder or felony murder, you must first determine whether mitigating circumstances, if any, would cause the offense to be reduced to voluntary manslaughter." The jury apparently found no such mitigating circumstances present here, and the evidence was sufficient to support that finding. See *Watkins v.*

---

[6] Pursuant to OCGA § 16-5-2 (a),

[a] person commits the offense of voluntary manslaughter when he causes the death of another human being under circumstances which would otherwise be murder and if he acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person; however, if there should have been an interval between the provocation and the killing sufficient for the voice of reason and humanity to be heard, of which the jury in all cases shall be the judge, the killing shall be attributed to deliberate revenge and be punished as murder.

19

*State*, 313 Ga. 573, 576 (2) (872 SE2d 293) (2022).

As noted above, the evidence showed that Banks and Smith— who were unarmed—did not engage in any "provocation sufficient to excite" a "sudden, violent, and irresistible passion" in Appellant when the shootings occurred. *Ware v. State*, 303 Ga. 847, 849-850 (III) (815 SE2d 837) (2018). Banks was retreating from Appellant's yard at the time Appellant shot him, and Smith was simply getting out of the car—presumably to check on Banks. And, the prior difficulties between these parties were insufficient to demonstrate provocation in this case. See *Francis v. State*, 296 Ga. 190, 193 (2) (766 SE2d 52) (2014) (holding that "words alone generally are not sufficient provocation to excite the passion necessary to give rise to voluntary manslaughter").

Accordingly, after properly viewing the evidence in the light most favorable to the verdicts, we conclude that the evidence was sufficient under the *Jackson* standard for a jury to find Appellant guilty beyond a reasonable doubt of all the crimes of which he was convicted. See *Jackson*, 443 U.S. at 319 (III) (B). See also *Boyd v.*

20

*State*, 306 Ga. 204, 207 (1) (830 SE2d 160) (2019).

2. Appellant also contends that the trial judge erred by not recusing himself from this case, alleging that certain of the trial judge's comments and conduct during trial demonstrated a lack of impartiality and a bias in favor of the State. We see no merit to this contention.

First, Appellant asserts that, after the State rested its case, the trial judge interjected during trial counsel's direct examination of witnesses—often without any objection from the State—but did not interject when the State was examining witnesses on direct or cross. Appellant argues that the trial judge's interjections during only the defense portion of the case could have made Appellant's witnesses look less credible in the eyes of the jury. Appellant cites to numerous pages of the trial transcript where the trial court made comments during Appellant's examination of witnesses, but does not argue that any specific comments, by themselves, demonstrated a bias in favor of the State.

Appellant also claims that two specific instances during trial

21

demonstrated the trial judge's bias in favor of the State. The first alleged instance occurred during the charge conference—outside the presence of the jury—when Appellant asked the trial judge to give the following jury charge defining "forcible felony": "A forcible felony is any felony that involves the use or threat of force or violence against any person. (Insert name of offense) is a felony, defined as follows: (Give Definition of Felony)." Appellant argued that this charge was appropriate to explain to the jury that, if it found the victims were attempting to inflict a "forcible felony" on Appellant, the jury could find Appellant "not guilty based upon self-defense." The State argued that this charge did not adequately define any offense, and Appellant responded that the trial judge could insert the name of any felony in this case—murder, felony murder, aggravated assault, etc.—as they were all potentially applicable to what the victims were attempting to inflict upon Appellant.

The trial judge disagreed, explaining that, in the context of the evidence presented at trial, it was not clear which offense should be included and defined in the requested instruction. The trial judge

22

stated, "There was a threat of fight, that's the most I feel you could say, counsel.  I know what you're arguing. Lucky for you I'm not on this jury, I don't buy it, and what they buy is on them."  Then, after hearing again from both parties, the trial judge declined to "define a forcible felony in this case," stating,

> I think given the convoluted nature of the facts that have been presented in this case the only way if I give this I am in some way I feel commenting, maybe not commenting, but at least inserting, the Court's—as it relates to it. You can argue all you wish as it relates to that. And to me that term is not one that needs a definition. Any forcible felony. You can talk about that all day long.  You know, assaults, battery, you know, all the way up to murder and everything in between that would have occurred there as well.

Appellant then inquired of the trial judge, "So by not giving it you're not in any way limiting my ability to make those arguments to the jury?"  The trial judge responded, "No, that's what your whole argument is; am I right?"

The next alleged instance of bias took place when the jury returned the verdicts and the trial judge reviewed the verdict form. The trial judge observed that the jury failed to render a verdict on

one of the gun possession counts, so the trial court returned the verdict form to the foreperson, stating, "You've got a count you did not complete.  It's just the third page back there, and sign it for me.  Probably won't take but a second[.]"

Appellant contends that the trial judge's interjections during trial counsel's examination of witnesses and his comments on Appellant's requested jury charge showed partiality and bias in favor of the State, and thus, the trial judge should have recused himself, citing *Johnson v. State*, 278 Ga. 344, 348 (3) (602 SE2d 623) (2004) (noting that trial judges are bound to recuse themselves whenever their impartiality might reasonably be questioned). Appellant also contends that the trial judge's comment to the jury that it would only take "a second" to complete the verdict form was "a direct statement on the guilt of the accused" and clearly showed a lack of impartiality by the trial judge.  We disagree.

As an initial matter, the record shows that, at the time of trial, Appellant "was aware of the circumstances that, he says on appeal, evidence the partiality of the judge." *Pyatt v. State*, 298 Ga. 742, 749

24

(5) (784 SE2d 759) (2016). Even so, Appellant did not object to any of the trial judge's conduct or comments during trial and "filed no motion to recuse the trial judge." Id.

"Generally speaking, '[w]hen a party learns of grounds for the potential disqualification of the judge, he must promptly move for the recusal of the judge, and if he does not, the question of disqualification is not preserved for appellate review.'" *Pyatt*, 298 Ga. at 749 (5) (quoting *State v. Hargis*, 294 Ga. 818, 821 (1) (756 SE2d 529) (2014)). Here, however, Appellant "waited until after he had been tried, convicted, and sentenced to raise the recusal issue, which he first asserted in his []amended motion for new trial." *Battle v. State*, 298 Ga. 661, 666 (2) (a) (784 SE2d 381) (2016). See also *Butts v. State*, 273 Ga. 760, 762 (3) (546 SE2d 472) (2001) ("We find that the issue of the trial judge's alleged error for failing to recuse herself is waived because Butts and his trial counsel failed to raise the issue at or before trial."). Accordingly, "[u]nder our precedents, [Appellant] has failed to preserve any claim of error about the partiality of the trial judge for appellate review." *Pyatt*,

25

298 Ga. at 750 (5).

However, "[e]ven assuming [a] trial judge's failure to recuse could in a rare instance constitute reversible error even though the parties knew of the grounds for recusal but did not make a motion, there is no reversible error here." *Barnett v. State*, 300 Ga. 551, 554 (2) (796 SE2d 653) (2017). "Judges shall disqualify themselves in any proceeding in which their impartiality might reasonably be questioned." Id. But the record in this case shows there was no such partiality here.

First, as to Appellant's contention that the trial judge improperly interjected himself during trial counsel's questioning of witnesses—allegedly demonstrating partiality in favor of the State—that contention is unsupported by the record. The record reflects that, throughout the trial and during both parties' questioning of witnesses, the trial judge interjected only when necessary to prevent the solicitation of hearsay testimony or the leading of witnesses, among other things.

"It is the duty of the trial [judge] to control the trial of the case

26

and to ensure a fair trial to both sides on the disputed issues in the case[,]" and "[s]ometimes this requires interference by the court with the conduct of counsel." *Bonner v. State*, 295 Ga. 10, 15 (3) (757 SE2d 118) (2014) (citation and punctuation omitted). Appellant has not shown that the trial judge's interjections were anything other than the use of the trial court's discretion to ensure that the proceedings were "orderly and fair" and that the "rules of evidence and procedure [were] followed." *Johnson*, 278 Ga. at 348. See also *Smith v. State*, 297 Ga. 268, 270 (2) (773 SE2d 269) (2015) ("[A] trial court has considerable discretion to control the trial of the case to ensure a fair trial and the orderly administration justice.").

Additionally, the trial judge's denial of Appellant's request to charge the jury on the definition of forcible felony occurred during the charge conference outside the presence of the jury. And the record does not reflect and Appellant has not shown that this ruling demonstrated any partiality on the part of the judge or any bias on his part in favor of the State. "Judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Barnett*, 300

27

Ga. at 555 (2) (citation and punctuation omitted).

With respect to the trial judge's statement when he advised the jury that it needed to complete a count on the verdict form—i.e., that it "[p]robably won't take but a second"—the most reasonable way to construe this statement, when read in context, is that the trial judge was instructing the jury to complete an administrative task—i.e., to finish filling out the verdict form that the jury had already discussed one way or another. Appellant has failed to offer any evidence supporting an alternate reading, and he has not shown—and the record does not demonstrate—that this statement was in any way motivated by any alleged bias in favor of the State or was a violation of the trial judge's duty to maintain his impartiality. See *Barnett*, 300 Ga. at 554-556 (2).

As to any allegation that Appellant was "denied a trial before a fair and impartial judge in violation of the constitutional guarantee of due process," the record in this case "discloses no actual bias and involves no circumstance that has been recognized as presenting an intolerably high probability of actual bias." *Pyatt*, 298

28

Ga. at 752-753 (5). "The law presumes honesty and integrity on the part of those serving as adjudicators, and [Appellant] has failed to overcome the presumption in this case." Id. at 753 (citation and punctuation omitted).

3. Finally, Appellant contends that the trial court "erred by allowing improper extrinsic evidence to be presented at trial," citing *Jackson v. State*, 306 Ga. 69 (829 SE2d 142) (2019). This contention fails.

In a pretrial motion in limine, Appellant moved to exclude any evidence or testimony related to the alleged use, sale, or purchase of illegal substances on Appellant's part, and at the pretrial hearing, Appellant requested that "the State not be allowed to bring up [] uncorroborated allegations by Quantavious Banks that there was some kind of drug sale or drug activity being conducted by [Appellant]." In response, the State argued that the specific drug transaction between Appellant and Banks that Appellant sought to exclude was intrinsic to the crime because it initiated the dispute between Appellant and the victims, and so, "even if it incidentally

29

might place any character issues on the table," the evidence was admissible. The trial court agreed and denied Appellant's motion in limine, concluding that this evidence was intrinsic to the crimes.

On appeal, Appellant contends that the trial court erred in allowing this evidence to be presented at trial because the charges in this case were "associated with the shooting death of [Smith]," and evidence that Appellant "sold or used marijuana could not make any material fact surrounding the death of [Smith] more probable, therefore making the evidence irrelevant." Appellant also contends that this evidence "reflected highly negatively on Appellant's character," and that, "[e]ven if the [trial court] was correct in finding the evidence relevant, the evidence should have been excluded due to its extreme prejudicial value."

Appellant's contention that evidence of the drug transaction between Appellant and Banks was "improper extrinsic evidence" is incorrect. "The limitations and prohibition on 'other acts' evidence set out in OCGA § 24–4–404 (b)[7] do not apply to intrinsic evidence."

[7] Pursuant to OCGA § 24-4-404 (b):

*Williams v. State*, 302 Ga. 474, 485 (IV) (d) (807 SE2d 350) (2017)

(citation and punctuation omitted). "Evidence is admissible as intrinsic evidence when it is (1) an uncharged offense arising from the same transaction or series of transactions as the charged offense; (2) necessary to complete the story of the crime; or (3) inextricably intertwined with the evidence regarding the charged offense." Id. (citation and punctuation omitted).

> In applying these factors, this Court has explained that
>
> [e]vidence pertaining to the chain of events explaining the context, motive, and set-up of the crime is properly admitted if it is linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury. Evidence of other acts

Evidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. The prosecution in a criminal proceeding shall provide reasonable notice to the defense in advance of trial, unless pretrial notice is excused by the court upon good cause shown, of the general nature of any such evidence it intends to introduce at trial. Notice shall not be required when the evidence of prior crimes, wrongs, or acts is offered to prove the circumstances immediately surrounding the charged crime, motive, or prior difficulties between the accused and the alleged victim.

31

is inextricably intertwined with the evidence regarding the charged offense if it forms an integral and natural part of the witness's accounts of the circumstances surrounding the offenses for which the defendant was indicted. And this sort of intrinsic evidence remains admissible even if it incidentally places the defendant's character at issue.

*Heade v. State*, 312 Ga. 19, 24-25 (3) (860 SE2d 509) (2021), (citations and punctuation omitted). Moreover, "[t]here is no brightline rule regarding how close in time evidence must be to the charged offenses, or requiring evidence to pertain directly to the victims of the charged offenses, for that evidence to be admitted properly as intrinsic evidence." Id. at 25 (3) (citation and punctuation omitted).

The story of this case began with a drug transaction. The evidence showed that, when Banks paid Appellant for marijuana that he did not receive and then, in retribution, took from Appellant either money or marijuana that Banks did not pay for, a dispute arose between these men that festered, leading to the shootings of Banks and Smith. And, during Appellant's custodial interview with the police, he discussed this dispute at length, confirming that it

started when Banks took Appellant's "stuff" or "money" and escalated over the next two weeks as threatening exchanges and encounters occurred, directly resulting in the shootings of Banks and Smith. As such, Appellant's own statements rendered this evidence intrinsic.

This evidence was "necessary to complete the story of the crime for the jury," *Heade*, 312 Ga. at 24-25 (3), and to explain why Appellant and Banks were engaged in an ongoing feud that led to the shootings. The evidence was also "inextricably intertwined with the evidence" regarding the crimes for which Appellant was indicted because it formed "an integral and natural part" of Appellant's account of the circumstances surrounding the crimes and explained how the dispute between Appellant and Banks originated. Id. at 25 (3). Without evidence of the initial drug transaction and Banks's theft of marijuana or money from Appellant afterwards, there would be no explanation for the dispute between Appellant and Banks and for the subsequent threats and confrontations that took place—

33

about which Appellant's friends and family members testified extensively. See id.

Accordingly, we conclude that evidence of the drug transaction was relevant and "properly admitted as intrinsic evidence, so we need not address its potential admission as extrinsic evidence under Rule 404 (b)." *Heade*, 312 Ga. at 24 (3). See also *Smith v. State*, 307 Ga. 263, 272 (2) (c) (834 SE2d 1) (2019) ("[B]ecause the evidence was intrinsic, it was outside the reach of Rule 404 (b)." (citation and punctuation omitted)). And, while "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence," OCGA § 24-4-403, "there is no mechanical solution for this balancing test." *State v. Jones*, 297 Ga. 156, 163 (3) (773 SE2d 170) (2015).

> Instead, a trial court must undertake in each case a considered evaluation of the proffered justification for the admission of such evidence and make an independent determination of whether the probative value of the evidence is substantially outweighed by the danger of

> unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Id. at 175-176 (citation and punctuation omitted). "We have explained that this balance should be struck in favor of admissibility," *Heade*, 312 Ga. at 25 (3), and in this case, the testimony concerning the drug transaction was highly probative and necessary to explain the context of the crime. See *Hughes v. State*, 312 Ga. 149, 153 (1) (861 SE2d 94) (2021).

Although Appellant's character might have incidentally been placed at issue by evidence that he sold drugs, any prejudicial impact Appellant suffered as a result of the admission of this evidence did not outweigh its probative value under OCGA § 24-4-403. In fact, Appellant relied upon this botched drug transaction and the ensuing dispute to attempt to justify the shootings in this case. Accordingly, we hold that the trial court did not abuse its discretion in finding that evidence of the drug transaction was admissible.

*Judgment affirmed. All the Justices concur.*