NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: August 12, 2025

S25A0959.  ROUSE v. THE STATE.

LAGRUA, Justice.

Appellant Terrence Rouse was found guilty on three counts of felony murder and related crimes in connection with the shooting death of Jamaal Smith.[1] On appeal, Rouse raises three

---

[1] The crimes occurred on November 16, 2020. A Houston County grand jury indicted Rouse and co-defendants Jakobe Brown and Jamaurie Moss in connection with Smith's death on December 12, 2021. The indictment charged each of the three with felony murder predicated on armed robbery (Count 1); felony murder predicated on home invasion (Count 2); felony murder predicated on aggravated assault (Count 3); criminal attempt to commit armed robbery (Count 4); home invasion (Count 5); and aggravated assault (Count 6). Rouse was also charged with possession of a firearm by a convicted felon (Count 7). Rouse was tried individually on April 11-15, 2022 and found guilty on Counts 1-6. Count 7 was nolle prossed after the verdict. On April 27, 2022, Rouse was sentenced to life with the possibility of parole for Count 1 (felony murder predicated on armed robbery) with Counts 2-6 merging into Count 1. We note that the trial court erred at sentencing by merging Counts 2 and 3 into Count 1, rather than vacating Counts 2 and 3 by operation of law. See *Noel v. State*, 297 Ga. 698, 700 (2015) ("[A] defendant found guilty of the felony murder of the same victim through the commission of more than one felony may only be sentenced on one felony murder charge, and the remaining felony murder charges stand vacated by operation of law.") (citation omitted).

enumerations of error. First, he argues that the evidence presented at trial was insufficient to sustain his conviction as a matter of constitutional due process under *Jackson*[2] and its progeny and on various statutory grounds. Second, he argues that his trial counsel was ineffective for offering into evidence, but not publishing, two jail letters addressed to co-defendant Jemaurie Moss that were authored by co-defendant Jakobe Brown while in custody. Third, he argues that the trial court abused its discretion by admitting testimonial evidence from Tavares Booker regarding his first-hand account of a drug deal that devolved into an argument between Rouse and Booker's roommate, Deshannon Gibson, in the weeks before the shooting. Each enumeration of error lacks merit, and we

---

However, this error does not affect Rouse's sentence and is otherwise harmless. *Hood v. State*, 303 Ga. 400, 424 (2018). We express no opinion as to whether Counts 5 and 6 were properly merged. See *Dixon v. State*, 302 Ga. 691, 696–97 (2017) (citations omitted) (explaining that this Court retains discretion to correct harmless sentencing errors).

Rouse filed a motion for new trial on May 26, 2022 and an amended motion for new trial through new counsel on December 17, 2024. After a hearing, Rouse's amended motion for new trial was denied on February 5, 2025. Rouse timely filed a notice of appeal, which was docketed to the April 2025 term of this Court and submitted for a decision on the briefs.

[2] See *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

affirm.

The evidence presented at trial showed that Smith was fatally shot during an attempted robbery on the night of November 16, 2020. That night, Booker was inside his apartment at the Cedar Pointe apartment complex ("Cedar Pointe") when he heard a knock on his door. Booker did not recognize the person on his doorstep, but he opened the door anyway and learned that this person was "looking for some weed." A marijuana purchaser on Booker's doorstep was not unusual, because Booker lived in his apartment with Gibson, who was also known as "Champ," and Gibson sold marijuana out of Booker's apartment.[3] Booker invited the purchaser inside, told him to shut the door behind him, and began walking toward the kitchen to retrieve Gibson's paraphernalia. Booker testified that, seconds later, "a second dude came around from the side of the building," "kicked in" the half-closed door "with a gun in

---

[3] Booker testified that Rouse had come to Booker's apartment in the weeks prior to November 16, 2020 to purchase marijuana from Gibson. Booker was present for that drug deal, which devolved into a "heated" argument between Gibson and Rouse.

his hand," and fired in Booker's direction. Booker then pulled out his own gun and fired several times in the direction of the front door. The purchaser and the "second guy with the pistol" fled Booker's apartment in different directions. Booker followed them out the door and fired twice more from his doorstep. He then went back inside, and called Gibson, but not the police. Gibson picked up Booker after this "drug deal gone bad" and took him to a friend's house, where Booker gave Gibson his gun to put "in a safe spot." Booker went back to his apartment (now a crime scene) later that night, gave a statement to officers with the Warner Robins Police Department, and assisted officers in recovering his gun. Booker told the police that he was unable to identify either of the perpetrators.[4]

Earlier that day, three teenage friends from school – co-defendants Moss and Brown, and the victim, Smith – met up before a concert they planned to attend in Macon later that night. The three friends traveled together in Moss's car to an acquaintance's home,

___

[4] Booker testified that the purchaser had on a hoodie "with the string pulled tight" around his face and that the "second dude with the pistol" was wearing a face-covering mask.

where they were approached by Rouse. Rouse asked them if he could get a ride to Cedar Pointe in exchange for $20 so that Rouse could "go get some weed." They agreed to this exchange, and Moss drove the four of them to Cedar Pointe. At Cedar Pointe, Rouse told Moss where to park and then got out of the car. Moss and Brown testified that they first saw Rouse with a gun when he exited the car. Rouse then opened the rear passenger door (next to where Smith was seated) and asked the three friends to "come over here right quick so that I can get the rest of this weed and give y'all $20" and told them that he "got this lick."[5] Each of the three friends initially declined, but Rouse persisted, called them names for not wanting to come, and explained that someone named "Champ" had "shorted [Rouse] on his weed last time" and "owe[d] [Rouse] some money." Smith agreed to go with Rouse while Brown and Moss remained in the car. Rouse and Smith walked away from the car, into a field, and out of sight.

A couple minutes later, Brown followed in that same direction

---

[5] Moss and Brown both testified that they knew a "lick" meant a robbery.

because he and Moss were worried about Smith, and the situation did not "feel right." Brown testified that he turned a corner to see an open apartment door and Rouse crouched on the side of that apartment with a gun. Brown did not see Smith. Brown testified that Rouse then ran into the apartment, and Brown heard several gunshots. Brown "took off running back to the car" when the gunshots rang out. Moss also heard gunshots from the car and was "fixin' to pull off" just as Brown made it back to the car. Moss and Brown saw Smith in the field, so Brown doubled back to help Smith – who had sustained a gunshot wound to the chest – get into the backseat of Moss's car. Brown testified that, when he asked Smith what happened, Smith responded: "I was trying to get -- run out the house and he shot me." Neither Moss nor Brown saw Rouse after the shooting, and they never called the police.

Moss drove Brown and the wounded Smith to the hospital. After Smith was taken inside, Moss and Brown left. Attempts to save Smith's life at the hospital were unsuccessful, and the medical examiner who conducted an autopsy on Smith testified at trial that

6

the cause of death was a single gunshot wound to the chest and that the manner of death was homicide. The State's expert in firearms and ballistics testified at trial that four shell casings recovered at Booker's apartment were fired from Booker's gun. This expert also compared a test-fired bullet to the fatal bullet recovered during Smith's autopsy. The expert testified that "class characteristics were consistent" between the two bullets, but there was also "a lot of damage" to them, such that he could not conclusively "identify [the fatal bullet] or eliminate [the fatal bullet] as having been fired from" Booker's gun.

After leaving the hospital, Moss dropped off Brown and went home, where he "tried to clean out" Smith's blood from his car with water, bleach, a knife, and some rags. Police, responding to a BOLO[6] on a car that "had dropped off a shot victim at the hospital," located Moss while he was cleaning his car.[7] Moss was detained, his car was

---

[6] BOLO stands for "[b]e on the lookout [for]." See BOLO, Black's Law Dictionary (12th ed. 2024) ("Police sometimes use this expression for people or vehicles that they are trying to locate.").

[7] Officer Daron Gray's bodycam footage was admitted into evidence and

secured (and subsequently searched),[8] and Moss was taken by officers to the police department, where he gave a statement to Detective Trent VanLannen. In his statement, Moss identified Rouse as the perpetrator of the attempted robbery at Cedar Pointe. Moss also identified Rouse as the perpetrator of the attempted robbery at trial.

After Brown had been dropped off by Moss, Brown informed members of Smith's family what had happened and went to the home of Smith's mother. Smith's mother called the police, who picked up Brown from her home and took him to the police department, where Brown gave a statement to Detective VanLannen. Brown identified Rouse as the perpetrator of the attempted robbery at Cedar Pointe in his statement to Detective

---

depicts his interactions with Moss. Several photos taken of Moss's car after the shooting were also admitted into evidence.

[8] In addition to searching Moss's car and collecting evidence, officers conducted print comparison testing on impressions lifted from that car. Officer Juan Herrara (the State's finger and handprint expert) testified there was "no doubt" that a handprint on the exterior of the car belonged to Rouse, but he was unable to associate any prints inside the car with Rouse.

VanLannen and testified to this fact at trial.[9]

On November 18, 2020, a warrant issued for Rouse's arrest in connection with the attempted robbery and shooting at Cedar Pointe, though he was not apprehended until January 5, 2021, in Florida. Moss and Brown were also arrested and charged as Rouse's co-defendants in Counts 1-6. See n.1 *supra.* At the time of Rouse's trial, charges against Moss and Brown were still pending, both were housed at the Peach County jail, both had met with prosecutors and agreed to testify against Rouse, and both testified that they had not been promised anything in exchange for their testimony.

At Rouse's trial, Moss testified before Brown. While Moss was on the stand, Rouse's counsel asked whether Moss and Brown had communicated in jail about the testimony they planned to give. Moss said they had not. Rouse's counsel then showed Moss two letters and inquired whether Moss had seen them before. Importantly, the

---

[9] Moss and Brown both conceded at trial that the version of events articulated to officers in the hours after the shooting did not align perfectly with the version of events that they testified to at trial. Moss said that he told police "most," but not all, of the facts that he testified to at trial. Brown also admitted he did not tell the full truth in his initial interview.

letters had not been admitted into evidence at this point, and their contents were unknown to the jury. Moss testified that he had seen the letters for the first time over the previous weekend when he was shown them by his attorney. No additional testimony was elicited from Moss regarding the letters or their contents.

During Brown's testimony, Rouse's counsel presented the letters to Brown and asked whether Brown recognized them. Brown said he did not. Rouse's counsel then asked Brown whether he wrote one of the letters to Moss to which Brown responded: "It's my handwriting, but I don't remember writing it. The only letter I wrote Mr. Moss was about telling him to keep his head up. That's it." However, Brown went on to concede that he wrote this letter to Moss "at some point," and the letter was admitted into evidence. Brown similarly testified that the second letter was in his handwriting and had been written by him to Moss but maintained that he did not recall writing either letter. The second letter was also admitted into evidence. In questioning Brown about these letters, Rouse's counsel got Brown to admit that many of the facts which he had testified to

10

were set out in these letters intended for Moss; however, the specific contents of the letters were not read or published for the jury.

These two letters, admitted into evidence through Brown, were the only evidence put up by the defense, and Rouse did not testify. During closing arguments, Rouse's counsel argued that Rouse was never at Cedar Pointe, told the jury that Moss, Brown, and Booker were all unreliable witnesses and highlighted inconsistencies in their testimony, noted that Moss and Brown in particular had motivations to lie and had conspired regarding their testimony (as shown by the jail letters), pointed out the State's minimal physical evidence connecting Rouse to the crime, and attempted to discredit the State's theory of motive. However, the jury returned guilty verdicts on Counts 1-6, and Rouse was sentenced accordingly. Following the denial of his amended motion for new trial, see n.1 supra., Rouse appealed.

1. Rouse argues that the evidence supporting his conviction was insufficient as a matter of constitutional due process under *Jackson* and its progeny, as well as on various statutory grounds,

11

and that his conviction should be reversed. See 443 U.S. at 319. We disagree.

(a) In a sufficiency review, "we view the evidence presented at trial in the light most favorable to the verdicts and consider whether it was sufficient to authorize a rational trier of fact to find the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted." *Wilkerson v. State*, 317 Ga. 242, 245 (2023). In so doing, we "leave[ ] to the jury the resolution of conflicts in the evidence, the weight of the evidence, the credibility of witnesses, and reasonable inferences to be made from basic facts to ultimate facts." Id. (citation and punctuation omitted).

Rouse's enumeration of error on sufficiency of the evidence is not a model of clarity, but he generally argues that "[t]he evidence was vague and ambiguous and conflicting at best." In furtherance of that position, he points to the State's minimal offering of physical evidence, along with the "questionable" testimony of the accomplice co-defendants, suggests that his conviction was supported only by circumstantial evidence, and appears to argue that the State failed

12

to prove that Rouse was a party to the crime. However, as set out below, each point made by Rouse lacks merit.

To the extent Rouse challenges his conviction because "[t]he only physical evidence in the case was a handprint on the roof of the getaway car that could have occurred at any time[,]" we observe that, while "the State is required to prove its case with competent evidence, there is no requirement that it prove its case with any particular sort of evidence." *Plez v. State*, 300 Ga. 505, 506 (2017). Thus, insofar as Rouse implies that more physical evidence was required to support his conviction, his argument fails.

Next, we reject Rouse's challenge to his conviction on the basis that it is supported by "questionable" accomplice testimony because the determination of whether witness testimony is "questionable" or credible is one left for the jury and not considered by this Court on review. See *Wilkerson*, 317 Ga. at 245 (explaining that matters relating to "the credibility of witnesses" fall within the province of a jury and will not be disturbed by the reviewing court in a sufficiency

13

review).[10]

(b) To the extent that Rouse argues his conviction was supported only by circumstantial evidence, he is incorrect. This argument appears to implicate OCGA § 24-14-6,[11] but that statute also does not apply here because first-hand eyewitness testimony – like that of Brown, Moss, and Booker – is direct evidence, and "if there is any direct evidence presented by the State, the circumstantial evidence statute does not apply in a sufficiency analysis." *Bradley v. State*, 318 Ga. 142, 144 (2024) (citing *Maynor*

---

[10] To the extent that Rouse separately argues here that the evidence supporting his conviction was insufficient as a matter of Georgia statutory law under OCGA § 24-14-8, his argument also fails. OCGA § 24-14-8 applies, among other circumstances, to "felony cases where the only witness is an accomplice[,]" and in such cases, requires "the testimony of a second witness" or other "corroborating circumstances" to sustain a conviction. OCGA § 24-14-8. Even assuming that Brown was an accomplice, Brown's testimony was consistent with the testimony of Booker and Moss, and that corroboration is sufficient for us to reject Rouse's contention. See *Nabors v. State,* 320 Ga. 43, 53 (2024) (explaining that "it is well settled that the testimony of one accomplice can corroborate the testimony of another") (citation omitted); *Head v. State*, 316, Ga. 406, 411 (2023) (explaining that corroboration for purposes of OCGA § 24-14-8 "may be circumstantial, slight, and need not be of itself sufficient to warrant a conviction of the crime charged") (citation omitted).

[11] OCGA § 24-14-6 provides: "To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused."

14

*v. State*, 317 Ga. 492, 498 (2023)).

(c) Insofar as Rouse raises an argument that he was not a party to the crimes under OCGA § 16-2-20[12] because "Booker does not put Rouse a[t] the crime scene," that argument also fails. The testimony of Moss and Brown put Rouse at the scene of the crime with a gun and established that the attempted robbery was Rouse's idea. Brown's testimony directly implicated Rouse as the shooter. And Brown's account of the shooting was corroborated by Booker's account of the shooting. Collectively, these facts support the jury's conclusion that Rouse was a party to the crimes.

For the reasons stated above, we conclude that the evidence was sufficient to support Rouse's conviction.

2. Rouse next argues that his trial counsel was ineffective for

---

[12] Pursuant to OCGA § 16-2-20 (a), "[e]very person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime." OCGA § 16-2-20 (b), in turn, provides that persons are "concerned in the commission of a crime" if he or she: "(1) Directly commits the crime; (2) Intentionally causes some other person to commit the crime under such circumstances that the other person is not guilty of any crime either in fact or because of legal incapacity; (3) Intentionally aids or abets in the commission of the crime; or (4) Intentionally advises, encourages, hires, counsels, or procures another to commit the crime."

15

not publishing the jail letters after they were offered into evidence and admitted by the trial court. We disagree.

To prevail on an ineffective assistance of counsel claim, a defendant must establish (1) that performance of his or her counsel was deficient and (2) that the deficient performance resulted in prejudice to the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "Deficient performance means that no reasonable lawyer would have done what trial counsel did, while prejudice means there is a reasonable likelihood that the outcome of the trial would have been different but for the deficient performance." *Parker v. State*, 320 Ga. 572, 579 (2024) (citation omitted). Failure to satisfy either prong is fatal to a claim. See *Lawrence v. State*, 286 Ga. 533, 533–34 (2010) ("If an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong.").

The record shows that Rouse's trial counsel offered the jail letters into evidence and that they were admitted by the trial court. On appeal, Rouse complains that his trial counsel "did not use that

opportunity to read them into evidence and publish them to the jury[,]" maintaining that this failure resulted in a handful of "missed benefit[s]" to the defense.[13] However, like the trial court, we see "no evidence that the decision not to publish the letters was anything but strategic."

As a general matter, decisions regarding trial strategy and tactics will not support an ineffectiveness claim "unless they were so patently unreasonable that no competent attorney would have followed such a course." *Warren v. State*, 314 Ga. 598, 602 (2022) (citation omitted). In large part, this is because "hindsight has no place in an assessment of the performance of trial counsel." *Bryant v. State*, 306 Ga. 687, 697 (2019).

Rouse fails to demonstrate how the decision not to publish the jail letters was an unreasonable trial strategy. At most, Rouse

---

[13] To the extent that Rouse's brief suggests that non-publication of the jail letters meant that the jury was unable to see the contents of those letters for themselves, his contention is misplaced. The trial transcript noted three exhibits which did not go out with the jury, but the jail letters are not so noted, and there is no indication in the record that these otherwise properly admitted jail letters did not go out with the jury.

argues that publication of the jail letters would have provided a greater opportunity for trial counsel to call into question the credibility and motivations of Moss and Brown than was afforded by way of cross-examination or closing arguments.[14] But the *Strickland* standard does not require trial counsel to take advantage of every possible opportunity to call witness testimony into question, as decisions surrounding when and how to impeach fit squarely within the realm of trial strategy. See *Dinkins v. State*, 300 Ga. 713, 716 (2017) ("The decision whether to impeach a witness is a matter of trial strategy that typically will not support a claim of ineffective assistance.") (citation omitted). Additionally, many of the statements included within the jail letters were inculpatory as to Rouse and consistent with the testimony given by Moss and Brown, which could have had the effect of strengthening, rather than

---

[14] We note that both co-defendants were impeached on cross-examination when Rouse's trial counsel got them to admit that their trial testimony was not fully consistent with the version of events articulated to the police after the shooting. Rouse's trial counsel also highlighted those inconsistencies during closing while making the point that Moss and Brown had reason to lie for their own benefit.

weakening, the reliability of Moss's and Brown's testimony. See *Sauder v. State*, 318 Ga. 791, 811 (2024) (concluding that trial counsel did not perform deficiently for failing to introduce "potentially inculpatory evidence") (citation omitted).

Because Rouse has not shown his trial counsel was deficient, we need not address prejudice, and his ineffectiveness claim fails. *Strickland*, 466 U.S. at 687; *Lawrence*, 286 Ga. at 533–34

3. Rouse's final enumeration of error is that the trial court abused its discretion under Rules 403 and 404 in allowing the State to elicit testimony from Booker concerning a prior drug deal between Gibson and Rouse. See OCGA §§ 24-4-403 and 24-4-404. For the reasons stated below, we see no error.

Just before Booker took the stand at trial (and outside the presence of the jury), the State raised with the trial court its intent to elicit testimony from Booker that Rouse was "in [Booker's] apartment a few weeks prior [to the shooting at issue here]" to purchase marijuana from Gibson, that this prior drug deal devolved into an "argument" between Gibson and Rouse "about quantity and

19

price" of the marijuana that Rouse wanted to purchase, and that this testimony was intrinsic evidence that should be admitted to show motive, such that it could be admitted without prior notice to the defense under OCGA § 24-4-404 (b) ("Rule 404 (b)"). Rouse's counsel objected, but did not seek a continuance, and argued that this testimony was not intrinsic evidence, such that Rule 404 (b)'s notice requirement needed to be satisfied – and, because notice was provided only 15 minutes prior, the evidence should be excluded under Rule 404 (b). The trial court disagreed, ruling that the evidence was intrinsic and, therefore, not subject to Rule 404 (b)'s notice requirement. Further, in its colloquy with Rouse's counsel and the State, the trial court found that while the evidence was "a little prejudicial" to Rouse, it was also "extremely probative," and admitted the intrinsic evidence on balance under OCGA § 24-4-403 ("Rule 403"). Booker went on to testify that Rouse was in his apartment a few weeks prior to the Cedar Pointe shooting to buy marijuana from Gibson and that an argument ensued between

20

Rouse and Gibson.[15]

To the extent that Rouse argues that the trial court abused its discretion by admitting Booker's testimony under Rule 404 (b), his arguments fail because "[t]he limitations and prohibition on 'other acts' evidence set out in OCGA § 24-4-404 (b) do not apply to intrinsic evidence." *Williams v. State*, 302 Ga. 474, 485 (2017) (footnote omitted). We review the admission of intrinsic evidence for abuse of discretion, *Abbott v. State*, 311 Ga. 478, 482–83 (2021), and have explained that "evidence pertaining to the chain of events explaining the context, motive, and set-up of the crime is properly admitted [as intrinsic] if it is linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury." *Heade v. State*, 312 Ga. 19, 25 (2021) (cleaned up). And "this sort of intrinsic evidence remains admissible even if it incidentally places the defendant's character at issue." Id. (citation omitted).

---

[15] The State went on to argue during closing that Rouse wanted to "hit that lick" as "payback" because Gibson had "embarrassed" and "disrespected" Rouse during this prior incident, and because Gibson "owed [Rouse] money."

Applying those standards here, we agree with the trial court that Booker's testimony was intrinsic to the Cedar Pointe shooting, as it was both "linked in time and circumstances with the charged crime" and "necessary to complete the story of the crime for the jury." *Callaway v. State*, 321 Ga. 186, 191 (2025); *Heade* 312 Ga. at 25. Specifically, this intrinsic evidence demonstrated that the attempted robbery was not a random act of violence, but a targeted "lick" intended for Gibson and Booker because – as Rouse told Moss and Brown upon their arrival at Cedar Pointe – Gibson had "shorted [Rouse] on his weed last time" and "owe[d] [Rouse] some money." Because the evidence was properly admitted as intrinsic evidence, the State was not obligated "to provide reasonable notice to the defense in advance of trial" under Rule 404 (b), and the mere fact that this evidence may have "incidentally placed" Rouse's character at issue does not otherwise render its admission improper. *Heade*, 312 Ga. at 25. Accordingly, the trial court did not abuse its discretion in this ruling.

We similarly reject Rouse's argument to the extent that he

argues the admission of this intrinsic evidence was an abuse of discretion under Rule 403. See *Coleman v. State*, 321 Ga. 476, 480 (2025) (observing that "intrinsic evidence must still satisfy Rule 403's balancing test"). Rule 403 provides in part that "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." OCGA § 24-4-403. While "inculpatory evidence in inherently prejudicial," we have explained that "it is only when *unfair* prejudice substantially outweighs probative value that the rule permits exclusion." *Anglin v. State*, 302 Ga. 333, 337 (2017) (citation omitted) (emphasis in original).

Here, the trial court expressly conducted Rule 403's balancing test before admitting Booker's testimony. In so doing, the trial court concluded that the probative value of Booker's testimony was high because the evidence explained why Rouse targeted Booker's apartment, despite the fact that the evidence was "a little prejudicial" to Rouse. On balance, the trial court ruled that the probative value of this evidence was not outweighed by an unfair

prejudicial effect, and we see no abuse of discretion in that conclusion. See OCGA § 24-4-403. Accordingly, Rouse's final enumeration fails.

4. To the extent that Rouse makes an argument predicated on cumulative error, that argument fails because he has not "carried his burden of showing that at least two errors were committed during trial." *Henderson v. State*, 318 Ga. 752, 759–60 (2024) (citation omitted).

For the reasons stated above, we conclude that the evidence supporting Rouse's conviction was sufficient, that Rouse's counsel was not ineffective, and that the trial court did not err in its evidentiary rulings. Accordingly, we affirm.

*Judgment affirmed. All the Justices concur, except Land. J., not participating.*