**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the

# Supreme Court of Georgia

No. S26A0214

Dexter Carridine

v.

The State

On Appeal from the Superior Court of Ware County
No. 2014SUR200

Decided: May 19, 2026

PINSON, Justice.

Dexter Carridine appeals his convictions for murder and other crimes arising from the shooting of Rodrez Deon Williams.[1]

---

[1] Williams died on the night between April 26 and 27, 2014. A Ware County grand jury returned a joint indictment charging Carridine and Torrence James Mitchell with malice murder, felony murder, aggravated assault, and possession of a firearm during the commission of a crime, and charging Carridine alone with possession of a firearm by a convicted felon. Carridine represented himself and was tried alone at a jury trial from March 14 to 17, 2016, and he was found guilty of all charges. The trial court sentenced him to life in prison for malice murder; a concurrent sentence of life in prison for felony murder; a concurrent sentence of 20 years for aggravated assault; and consecutive sentences of five years each for possession of a firearm during the commission of a crime and possession of a firearm by a convicted felon. Although not raised by the parties, the trial court erred by imposing sentences for both malice murder and felony murder; the charges were based on the death of one victim, so the felony murder count was vacated by operation of law. See *Heade v. State*, 312 Ga. 19, 29–30 (2021). We therefore vacate the sentence on Count 2. See *Robinson v. State*, 322 Ga. 299, 303 (2025) (exercising discretion to sua sponte correct merger errors where defendant was harmed).

On appeal, Carridine claims that the evidence was not sufficient to convict him of malice murder and that the trial court abused its discretion by denying his motion to continue the trial so he could hire private counsel, and by allowing him to represent himself at trial. But the evidence, which we recount below, was sufficient. The trial court did not abuse its discretion by denying a continuance in light of Carridine's failure to show reasonable diligence in seeking private counsel. And the record shows that the trial court thoroughly advised Carridine of his right to counsel and he knowingly and intelligently relinquished that right. However, as explained below, we exercise our discretion to vacate the judgment in part to correct a sentencing error.

1. Carridine claims that the evidence was not sufficient as a matter of federal constitutional due process to support his conviction for malice murder. To review such a claim, we consider the evidence in the light most favorable to the verdict and assess whether "'*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Mills v. State*, 320 Ga. 457, 461 (2024) (quoting *Jackson v. Virginia*, 443 US 307, 319 (1979)). In doing so, we "defer to the jury's assessment of the weight and credibility of the evidence" and neither weigh the evidence nor resolve any conflicts in the trial testimony. *Chambliss v. State*, 318 Ga. 161, 163 (2023) (cleaned up). So we first recount

Through appointed post-trial counsel, Carridine timely filed a motion for new trial on March 21, 2016, and the motion was later amended by new counsel on October 18, 2019. After a hearing on October 23, 2019, the trial court denied the amended motion on February 4, 2020. Carridine filed a timely notice of appeal on March 6, 2020. The trial court did not transmit the record to this Court until August 29, 2025, and the trial court clerk's certification noted that this delay was due to the "stress of work in the Clerk's Office." The case was then docketed to the term of court beginning in December 2025 and submitted for a decision on the briefs.

the evidence at trial in the light most favorable to the verdict and then consider it under the appropriate standard of review.

(a) The evidence at trial showed the following.

Latisha Morris was in a relationship with the victim, Williams. On the night of April 26, 2014, Morris and Williams were at home, and Williams was on the phone with someone. Williams left "a little after ten" and drove Morris's car.

Carridine's co-indictee, Torrence James Mitchell, is Morris's brother. He testified that he saw Williams with Carridine at an apartment complex that night. Mitchell joined them and smoked marijuana. Williams and Carridine then asked Mitchell to drive them somewhere, and Mitchell agreed and drove them in Morris's car, which Williams had driven to the apartment complex.

Mitchell testified that Williams told him where to drive at first, but then Carridine started giving him directions. At some point, Carridine told Mitchell to stop and turn around. Mitchell testified that he pulled onto a "little dirt road," and when he put the car in reverse he "heard a shot …. One, two, and then another." The shots were coming from inside the car, and Mitchell stopped the car and got out.

Mitchell testified that Carridine got out of the backseat of the car and Williams got out of the front passenger seat, took "two or three steps," and fell. Mitchell testified that he "froze," and Carridine told him to "calm down." Mitchell did not see Carridine with a gun.

Carridine walked over to Williams, but Mitchell did not see what he did next. Then Carridine and Mitchell got back in the car, leaving Williams behind. Mitchell drove to another location,

3

and they left the car there. They then walked back to the apartment complex, where Mitchell got into his own car and left. Mitchell testified that Carridine was still at the apartment complex then, and Mitchell did not know what Carridine did next.

The next morning, someone came across Williams's body and called 911. GBI Special Agent Kellyn Carter responded to the "little dirt path" where the body had been found. Agent Carter photographed the body and looked for wounds. After photographing the crime scene where Williams's body was found, Agent Carter was then called to another scene, where a car was found that investigators believed might be related to the shooting. Agent Carter photographed the car and saw that the front passenger side window was "shattered." Agent Carter also saw what appeared to be blood on the dashboard in front of the passenger seat and on the ledge of the passenger-side window (the one that was shattered). A GBI forensic biologist later identified the blood as Williams's. Agent Carter collected three cartridge casings inside the car, and a GBI firearms and toolmarks examiner determined that the bullets had all been fired from the same nine-millimeter gun.

The medical examiner testified that Williams had two gunshot wounds — to the back and left side of his head — that would not have been fatal on their own, and a fatal gunshot wound to the left side of his chest. Gunshot residue around the head wounds indicated that the gun was fired "close to" the skin but "wasn't touching the skin" when fired. The fatal gunshot wound appeared to be a "contact gunshot wound," meaning that the gun was touching Williams's skin or clothing when it was fired. The medical examiner testified that the cause of Williams's death was multiple gunshot wounds.

4

During the investigation, Jervis Moody, who knew Carridine, told GBI Agent Dale Wiley that in May 2014, he saw Carradine "throw stuff away" near Moody's home. Moody testified that Carridine told him that he had thrown a phone away because of a fight with his wife over some photos of Carridine and another woman. Agent Wiley went to the location where Moody had seen Carridine throw something away and found two cell phones in a storm drain in the "general area" where Moody indicated. Agent Wiley collected the cell phones, and they were admitted at State's Exhibits 32 and 33.

State's Exhibit 32 was a Samsung phone registered to a phone number ending in 8679, and State's Exhibit 33 was a Samsung phone registered to a phone number ending in 8071. A detective processed the phones and testified that, except for two messages from the cellular company, the phone registered to the number ending in 8679 only sent text messages to, and received text messages from, a phone number ending in 8071. Morris identified State's Exhibit 33 as Williams's phone, which he bought a month before he died and "always had" with him." A records custodian from Verizon Wireless testified that the number associated with State's Exhibit 32 was connected to a pre-paid phone that was activated on April 26, 2014. Mitchell testified that he drove Carridine to Walmart on April 25, and Carridine bought a cell phone there. Surveillance footage showing that transaction was played for the jury.

Carradine called Chandra Studivent as a defense witness. She testified that Carridine did not know how to activate a cell phone. She also testified that Carridine was at home with her all night on April 26, 2014, and she typically went to bed between 10 and 10:30 p.m.

5

(b) Under OCGA § 16-5-1(a), a person commits malice murder "when he unlawfully and with malice aforethought, either express or implied, causes the death of another human being." The element of malice "incorporates the intent to kill." See *Scoggins v. State*, 317 Ga. 832, 836 (2023). Carridine fails to identify any element of malice murder for which the evidence was not sufficient as a matter of due process. Instead, he merely contends that the evidence was too thin to support his conviction as a general matter, pointing out various kinds of evidence that the State did not have, like the murder weapon or "forensic evidence."

But the State need not "prove its case with any particular sort of evidence." *Ivory v. State*, 322 Ga. 315, 317 (2025) (quotation marks omitted). And the evidence recounted above was sufficient to authorize the jury to find Carradine guilty of malice murder. That evidence showed that Carridine bought a new prepaid cell phone on the day before the murder, activated it the day of, and used it to communicate exclusively with Williams leading up to the murder. He later "dumped" that phone and Williams's phone in a storm drain. And on the night of the murder, Carridine was with Williams and asked Mitchell to drive them somewhere. Williams gave directions at first, but then Carridine took over and told Mitchell to turn around. When Mitchell did so, he heard three gunshots from inside the car. Everyone got out of the car, and only Williams fell to the ground. Mitchell and Carridine then left Williams on the ground, hid the car, and walked home.

Although Mitchell testified that he did not see Carridine with a gun, the jury could infer Carridine was the shooter based on evidence that Williams's blood was on the dashboard of the car and he suffered three gunshot wounds — two at close range and one "contact wound" — and only Carridine and Mitchell were in

6

the car with him when he was shot.[2] And the jury was authorized to disbelieve Studivent's testimony that Carridine was with her all night because she also testified that she typically went to bed by 10:30 p.m., and Morris testified that it was after 10 p.m. when Mitchell left their home, so it would have been even later when he met Carridine and Williams at the apartment complex that night. The jury could also infer malice, or the intent to kill Williams, from the evidence at trial, including the evidence that Carridine bought and used a prepaid phone to communicate with Williams leading up to the car ride where he shot him three times, and then got rid of the phone. In short, the evidence was sufficient to authorize the jury to find that Carridine committed malice murder. See, e.g., *Weems v. State*, 318 Ga. 98, 101 (2024) (evidence was sufficient to convict defendant of malice murder and possession of a firearm during the commission of a felony where witness heard gunshots coming from the defendant's room but did not see him with a gun, only the defendant "emerged from the room unharmed," and the defendant "left the scene immediately after the shooting").

2. On the morning of the first day of trial, Carridine told the trial court he wanted to fire his second appointed trial counsel and get a continuance so he could hire private counsel. He claims that the trial court abused its discretion by denying his motion to continue the trial and then allowing Carridine to represent himself. We recount the relevant circumstances leading to that decision and then address the continuance and self-representation claims in turn.

(a) At the outset of these proceedings, Carridine was ap-

---

[2] Carridine does not suggest that Mitchell was the shooter, nor was there any evidence that he was.

pointed counsel from the local public defender's office, and his appointed counsel filed various pretrial motions on his behalf. On August 7, 2015, the public defender filed a "Notice of Conflict and Motion to Continue" based on the representation of two material witnesses by the same public defender's office. The trial court granted the motion to continue and appointed conflict counsel to represent Carridine. In October 2015, the trial court granted Carridine's oral motion to continue the trial, setting a status conference for December and trial for the following February.

At the December 17, 2015, status hearing, the trial court asked the parties if they were "on track" for the trial set for February 22, 2016. The prosecutor said yes, and defense counsel said that "Carridine would like to address the court on some issues." Carridine told the court that he wanted to be "appointed new counsel" because neither of the attorneys who had represented him so far had "talked to any of [his] witnesses" or gotten discovery. He then repeated that he wanted the court to "appoint a new counsel." He also complained about decisions counsel had made about what motions to file.

The trial court told Carridine that his "lawyer has great discretion to decide what motions he thinks are proper and meritorious and which ones are not" and that Carridine could not "dictate to the lawyer what motions are going to be filed. … You've got to represent yourself or — or he's going to represent you." The court went on to note that Carridine had "been through one [attorney] already," was on his "second one," and the trial court was "not going to let you decide what lawyer you want." The trial court stated that defense counsel was a "competent" lawyer with "lots of experience" and that Carridine needed to work with his lawyer. And the trial court said that if Carridine continued to refuse to work with counsel, "he can represent himself if he wants to."

8

The trial scheduled for February was later continued at the State's request because a witness was not available. So the parties came before the court for trial on March 14, 2016. Defense counsel announced that he was ready for trial but that Carridine wanted to address the court again. Carridine said that he had filed a motion to remove his attorney for ineffective assistance. He also orally moved for a continuance based on what he described as pending motions to have the judge and his attorney removed from the case. The court informed Carridine that his lawyer had not filed any such motion, and Carridine could not file motions himself while represented by counsel. In response, Carridine said, "I stand as a sui juris. I do not need an attorney to speak on my behalf. I ask for a continuance because the State has yet to full — to produce full discovery."

The trial court asked, "you don't want a lawyer to represent you in this case?" and Carridine replied, "No, sir." The trial court told Carridine to "think about that very carefully before you make your decision," went over the charges, and reminded Carridine that he had a lawyer who was ready to go forward with trial that day. The trial court then asked if Carridine "want[ed] to represent [him]self in this matter," and Carridine said, "Yes, that I ask yes, I stand in full capacity of sui juris. I do not need an attorney to speak on my behalf." The trial court asked a third time if Carridine "want[ed] to represent [him]self?" and Carridine again said, "Yes, sir."

The trial court then began a colloquy with Carridine, asking about his date of birth, age, level of school completed, and his ability to read and write. Carridine responded that he was 41 years old, completed the tenth grade, and could read and write. When asked, Carridine said he had never before represented him-

9

self in any civil or criminal matter. The court then asked if Carridine understood "that's it's almost always unwise for a defendant to represent himself in court? Do you realize that?" And Carridine answered that he wanted a continuance "for, one, possibility of hiring an attorney." The trial court asked Carridine, "[W]hen did you decide you wanted to hire your own lawyer? How long ago? What month?" Carridine said "last month," and the trial court responded, "Well, last month was two weeks ago. Is that when you decided? You've been in — you've been in jail, what, two years now?" and Carridine said, "Yes, sir."

After briefly discussing other matters, the trial court said, "Now, you said a minute ago, you didn't need a lawyer; you were going to represent yourself …. And then just a moment ago, you said you want the case continued so you can hire your lawyer. Which is it?" Carridine responded that he "move[d] to represent himself" and "for a motion to continue." The trial court asked again, "So you want to represent yourself. Am I right?" and Carridine said, "Yes, sir, that's going - if that's what it takes for me to get a continuance and get effective counsel." The trial court told Carridine that the court was not deciding the motion to continue at that time but was trying to determine whether Carridine would be allowed to represent himself.

The trial court told Carridine, "I've got to make sure you are making an informed decision about representing yourself. And so my question is do you understand that you may defend yourself ultimately to your own detriment? You might not be a very good lawyer for yourself. Do you understand that?" Carridine said yes. The trial court then asked, "Do you understand that you're entitled to no special treatment by the Court if you represent yourself? That is to say you've got to abide by the rules of evidence and the rules — Uniform Rules of the Superior Courts,

just like the lawyers do for the State." Carridine said, "I elect to represent myself and I ask for a continuance." The trial court again told Carridine that it was not addressing the motion to continue yet, only whether Carridine would represent himself. The trial court asked again, "Do you understand that you're not entitled to any special treatment by the Court if you represent yourself? You understand that, Mr. Carridine?" And Carridine said, "Yes sir. I understand."

The trial court continued its colloquy, asking whether Carridine understood that he "must follow all the technical rules of law, criminal procedure and evidence for the making of motions and objections, the presentation of evidence, jury selection, and argument, even if you do not know those rules," "that you'll have to abide by the same rules that it took lawyers years to learn," and "if you represent yourself, you're assuming full responsibility for your defense?" Carridine answered "yes" to each question. The trial court then asked, "Do you understand you may miss important defenses to the case because of your lack of knowledge of the law?" Carridine said, "No, sir," and the trial court responded "Well, in that case, you might want to think about letting a lawyer help you."

The trial court then asked, "Do you understand that even if you have some knowledge of the law, you will lose the benefit of an independent perspective of an attorney in analyzing, reviewing, and presenting the case in the most effective way?" Carridine responded, "Your Honor, without no dishonor, he is fired. I am firing my attorney. I move for a motion so that I can hire me an attorney." The trial court denied the motion to continue, and asked whether Carridine understood "that if you are found guilty, you may not be able to present the case in a manner to obtain the

most favorable sentence" because a lawyer would present mitigating evidence at the sentencing hearing that Carridine may not be able to do as effectively on his own. Instead of answering the question, Carridine repeated, "[M]y attorney is fired."

The trial court explained that because Carridine was in custody, his "access to the D.A.'s office will be reduced, making it more difficult to defend yourself because you'll have less chance to work out a favorable resolution" and asked if he understood. Carridine said again, "[M]y attorney is fired. I'm moving for a motion to continue so I can hire my own private attorney." The trial court then asked whether Carridine understood that the State would "be represented by an experienced and skilled attorney," and Carridine said he understood. The trial court then asked, "Do you understand that the prosecuting attorney will treat you just as the prosecutor would treat any other attorney and that the prosecutor will not go easy on you just because you represent yourself?" Instead of answering, Carridine said, "I move to fire my attorney."

The trial court then said, "Do you understand you won't receive any special treatment or help from the Court? I can't help you. I can't give you legal advice or direction." Carridine said, "No. Please explain it to me." The trial court explained that he could not tell Carridine that he should object to a question asked by the State even if it is "an improper question or he's leading his witness or something like that," and that he could not tell Carridine "you need to argue to the jury this or that or the other." But the trial court could tell Carridine that he "can't argue certain things to the jury, and I will if you argue something improper. I can't - I can't give you any special treatment. Do you understand that?" Again, Carridine did not answer the question but said, "I move to fire my attorney," and moved "for a continuance so I can hire me

12

a private attorney." The trial court reminded Carridine that it had already denied that motion, and then asked if he understood that the trial court could "terminate [his] self-representation" and "have [him] removed from the courtroom" for "disruptive" behavior. Carridine did not respond to the question and instead repeated his motion to continue, this time citing an alleged *Brady* violation because he had not received "full discovery."[3] The trial court did not respond to the motion and instead asked Carridine, "[D]o you understand if you get convicted of one or more of these offenses, you can't claim your own incompetency or ignorance of the law as a basis for appeal?" Again, Carridine did not respond, and the trial court reiterated, "If I let you represent yourself, you can't later say, I didn't know what I was doing." Instead of responding to the question, Carridine said, "I fire my attorney" and moved for a continuance. The trial court did not address the renewed motion for a continuance and instead asked, "Do you understand that if you have - you have the right to effective assistance of a lawyer at all stages? And I haven't seen anything that tells me [defense counsel] hasn't been effective."[4]

---

[3] See *Brady v. Maryland*, 373 US 83 (1963).

[4] The trial court separately questioned defense counsel about Carridine's allegations related to the failure to receive discovery, to communicate with him, and to reach out to witnesses. Defense counsel stated that Carridine had been given a copy of all discovery by his former counsel and again by present counsel. Defense counsel also contacted the District Attorney's office, which confirmed that all discovery had been turned over. Counsel said he had also reviewed the penalties for the charges and the discovery with Carridine. Counsel acknowledged that he had received but not responded to several letters from Carridine but had discussed the matters raised in those letters with Carridine when they met. Counsel had contacted or attempted to contact the witnesses Carridine wanted to call, and counsel was ready to go forward with

The trial court asked whether Carridine understood "that a lawyer would select a jury to try the case, which includes questioning and trying to remove jurors who would not be good jurors for you?" Carridine said he did not, so the trial court explained voir dire and told Carridine, "I think you'd be putting yourself at a disadvantage if you do that yourself; but, again, it's your decision. I'm just required to try to acquaint you with the pitfalls." The trial court then explained opening statements and how a lawyer would preview the evidence, and instead of responding when asked if he understood the process, Carridine said that his lawyer "hasn't done nothing" in his case to date and thrice repeated that he "fired" his appointed counsel.

Next, the trial court asked if Carridine understood that a lawyer would call witnesses, question them, and "present physical and documentary evidence" at trial. Carridine did not respond and instead stated that he had moved to have the judge removed from the case and complained about his appointed lawyer. The trial court continued questioning Carridine about his decision to represent himself, asking if Carridine understood that a lawyer would object to any improper questions asked by the prosecutor. Carridine did not answer the question and repeated again that his "lawyer is fired" and "I am firing my lawyer." The following exchange then took place:

> THE COURT: Okay. Okay. I can't force him upon you, and I'm not going to, but you need to make an

---

trial. The trial court found that there was no evidence that Carridine's appointed counsel had been ineffective and that counsel was prepared to go forward with the trial scheduled to begin that day.

14

informed decision about whether you're going to represent yourself.

DEFENDANT CARRIDINE: That's not what I said. I said I'm firing my attorney.

THE COURT: Yeah. And I said I'm not going to force him on you. I may allow you to do that, but you need to make an informed decision on whether you're going to represent yourself or not.

DEFENDANT CARRIDINE: I'm firing – I'm not - I move to a motion to a continuance. I am firing my lawyer.

THE COURT: All right. You want to represent yourself?

DEFENDANT CARRIDINE: No. I ask for a continuance.

THE COURT: Denied. I'm not going to continue your case, sir, when you fire your lawyer on the morning of jury selection. I'm not going to.

The trial court then made sure that Carridine had a copy of the indictment and asked him about it. Carridine confirmed that he had read the indictment and understood the charges but answered that he did not understand the penalties if he were to be convicted and had not discussed them with his attorney.[5]

---

[5] When the trial court questioned defense counsel, counsel said that he had explained to Carridine that if convicted of murder he could be sentenced to life in prison without parole.

The trial court told Carridine that he should "think real hard about whether or not you want to fire your lawyer" because appointed counsel was "prepared" to start trial that day and the court was "not going to continue [Carridine's] case." The trial court told Carridine that the parties would begin the jury selection process that day, and warned Carridine, "if you don't know the rules of evidence, if you're not educated and trained in the law, it's going to be very hard for you to defend yourself." The court reiterated that Carridine had a "constitutional right to represent [him]self" and that the court would not "deny [him] that right" but that the court also would "not continue this case."

The trial court asked again, "Are you sure you want to [go forward] without a lawyer?" Carridine responded, "You cannot force me to trial without a lawyer. I fired my lawyer," to which the trial court said, "Yeah, I can, and I'm about to do that. Anything else you want to say?" The following exchange then took place:

> DEFENDANT CARRIDINE: You can't force me to trial.
>
> THE COURT: You can - you can keep your lawyer if you want to now. This is it.
>
> DEFENDANT CARRIDINE: No. You can't force me to trial.
>
> THE COURT: Do you want him to sit with you?
>
> DEFENDANT CARRIDINE: (No response.)
>
> THE COURT: Okay, this is it. Do you want [defense counsel] to stay with you and help you?

DEFENDANT CARRIDINE: No, sir. I move for a continuance.

The trial court denied the motion to continue. Carridine then asked for 30 days to try to hire an attorney and said that he was "quite sure if [he] g[ot] with [his] family" he would be able to get the funds to hire a lawyer. The trial court did not entertain that request and asked twice if Carridine would like his appointed counsel to remain as standby counsel. Instead of answering, Carridine twice repeated his request for a continuance so he could hire an attorney. The trial court again denied the motion to continue. When the trial court asked a third time if Carridine wanted standby counsel and Carridine still did not respond, the trial court found "from the Defendant's lack of responding to my question that he declines standby counsel," relieved appointed counsel from his duties, and stated that the court would "allow [Carridine] to represent himself." The trial court then brought in prospective jurors and began voir dire, with Carridine representing himself through the end of his trial.

(b) Carridine claims that the trial court abused its discretion when it denied his motion to continue his case to retain private counsel. The decision to grant or deny a motion to continue is reviewed for an abuse of discretion, and to show that the denial of a continuance was reversible error, the defendant must show not only that the denial was an abuse of the trial court's discretion but also that the defendant was harmed by the denial. *Foster v. State*, 322 Ga. 425, 431 (2025).

Criminal defendants have a right to counsel under the Sixth Amendment to the United States Constitution, and to a "'fair opportunity to secure counsel of his choice'" unless he "relies on counsel provided by the State," at which point he is not entitled to have the State appoint the attorney of his choosing. Id. (citing

17

*Luis v. United States*, 578 US 5, 11 (2016)). To determine whether this right is violated by the denial of a request for continuance to obtain counsel, we look to "the facts of a particular case." *Reid v. State*, 237 Ga. 106, 107 (1976) (citing *United States v. Casey*, 480 F2d 151 (5th Cir. 1973)). In doing so, we have considered whether the facts establish that the defendant used "reasonable diligence" to retain the services of counsel of choice. See *Reid*, 237 Ga. at 107–08. In *Reid*, for example, the defendant's appointed counsel advised the trial court that he had been contacted by private attorneys who said they were considering the defendant's case, but the same attorneys had told the prosecutor that they were not going to represent the defendant. Id. at 107. This Court noted that the record "only suggested the mere possibility of [the private attorneys'] employment" so the defendant had not shown the diligence required under the Sixth Amendment and thus had not established that the trial court abused its discretion by moving forward with the trial, with the defendant represented by his appointed counsel. Id. at 108.

Like the defendant in *Reid*, Carridine presented the trial court only a "mere possibility" of retaining private counsel. In fact, he offered even less evidence of reasonable diligence than the defendant in *Reid*, who at least had been contacted by attorneys who had considered taking the case, whereas Carridine did not even suggest that he had spoken to a private attorney about possible representation. To the contrary, he failed to raise the possibility that he would hire his own private trial counsel until the morning of trial, even after the trial court had denied his motion for new appointed counsel three months earlier. Absent any showing of reasonable diligence in seeking to hire private counsel, and under the particular facts of this case, the trial court did not abuse its discretion by denying the motion for a continuance. See *Reid*, 237 Ga. at 107–08.

18

(c) Carridine next claims that the trial court erred in allowing him to represent himself at trial, in violation of the Sixth Amendment of the United States Constitution. The conclusion that a defendant waived his constitutional right to counsel must be supported by a "record" or "an allegation and evidence" that shows that the defendant "was offered counsel but intelligently and understandingly rejected the offer." *Carnley v. Cochran*, 369 US 506, 516 (1962). See also *Clarke v. Zant*, 247 Ga. 194, 196 (1981) (explaining that under the Sixth Amendment, waiver of the right to counsel requires both the "comprehension of rights" and the "relinquishment of rights"). To that end, a trial court must "apprise the accused of the dangers and disadvantages inherent in such a strategy so that the record will establish that he knows what he is doing and his choice is made with eyes open." *Harris v. State*, 269 Ga. 731, 733–34 (1998) (citing *Faretta v. California*, 422 US 806, 835 (1975) (quotation marks omitted)). Applying this standard, we have concluded that the record supported such a waiver when it showed the trial court "engaged in [a] lengthy colloquy" with the defendant and his attorney "and concluded, albeit with obvious reservations, that [the defendant] had made a sufficiently knowing and intelligent waiver and that he was competent to represent himself." *Harris*, 269 Ga. at 734. Such a finding "need not be tantamount to a finding that an accused is 'capable of good lawyering.'" Id.

As recounted at length above, the record here shows that Carridine was sufficiently advised of his right to counsel and knowingly and intelligently relinquished that right. See id. The trial court discussed the right to counsel and the pitfalls of self-representation with Carradine with great care and in substantial detail. Although Carridine apparently would have preferred to have a continuance to hire a different attorney, that continuance was denied (properly so, as discussed above) and he was left with

19

a clear choice to represent himself or go forward with his appointed counsel, who was ready for trial. He refused to continue forward with appointed counsel, repeatedly saying that counsel was "fired," which the trial court reasonably took to mean he was choosing the other available option: representing himself. The record makes clear that Carridine knew that refusing to go forward with his appointed counsel meant he would be representing himself at trial, that he was fully informed of the consequences of representing himself, and that he continued to refuse to move forward with appointed counsel anyway. Id. Under these circumstances, the record plainly shows that the trial court "offered [Carridine] counsel but [he] intelligently and understandingly rejected the offer," so the trial court did not err in concluding that Carridine had waived his right to counsel. See *Carnley*, 369 US at 516; *Clarke*, 247 Ga. at 196. So this claim fails.

3. As noted above, the trial court erred by sentencing Carridine to concurrent terms of life imprisonment for malice murder and felony murder. Because those charges were based on the death of one victim, the felony murder count was vacated as a matter of law. See *Heade v. State*, 312 Ga. 19, 29–30 (2021). Although this error was not raised by the parties, we exercise our discretion to vacate the sentence on Count 2 for felony murder. See *Robinson v. State*, 322 Ga. 299, 303 (2025).

*Judgment affirmed in part and vacated in part. All the Justices concur, except Warren, P.J., not participating.*